# EXHIBIT 3



**SAUL EWING ARNSTEIN & LEHR LLP**
Amy S. Kline, Pa. Bar ID # 84690
Jennifer L. Beidel, Pa. Bar ID # 204450
Centre Square West, 38th Floor
1500 Market Street
Philadelphia, Pennsylvania 19102-2186
Telephone: (215) 972-7180
Fax: (215) 972-1917
Amy.Kline@saul.com
Jennifer.Beidel@saul.com
*Attorneys for Plaintiff*

*Filed and Attested by the
Office of Judicial Records
18 APR 2022 07:30 pm
E. HAURIN*

---

## IN THE COURT OF COMMON PLEAS OF PHILADELPHIA COUNTY
### FIRST JUDICIAL DISTRICT OF PENNSYLVANIA

---

| | | |
|---|---|---|
| | : | |
| DELAWARE RIVER WATERFRONT CORPORATION, | : | CIVIL DIVISION |
| | : | |
| | : | |
| Plaintiff, | : | CIVIL ACTION |
| | : | |
| v. | : | |
| | : | NO.  211202070 |
| THE SAGE GROUP PLC and | : | |
| WELLSPRING SOFTWARE, INC. | : | |
| d/b/a PRINTBOSS, | : | |
| | : | JURY TRIAL DEMANDED |
| Defendants. | : | |

---

1

Case ID: 211202070

## NOTICE TO DEFEND

### NOTICE

You have been sued in court. If you wish to defend against the claims set forth in the following pages, you must take action within twenty (20) days after this complaint and notice are served, by entering a written appearance personally or by attorney and filing in writing with the court your defenses or objections to the claims set forth against you. You are warned that if you fail to do so the case may proceed without you and a judgment may be entered against you by the court without further notice for any money claimed in the complaint or for any other claim or relief requested by the plaintiff. You may lose money or property or other rights important to you.

*You should take this paper to your lawyer at once. If you do not have a lawyer or cannot afford one, go to or telephone the office set forth below to find out where you can get legal help.*

**Philadelphia Bar Association
Lawyer Referral
and Information Service
One Reading Center
Philadelphia, Pennsylvania 19107
(215) 238-6333
TTY (215) 451-6197**

### AVISO

Le han demandado a usted en la corte. Si usted quiere defenderse de estas demandas expuestas en las paginas siguientes, usted tiene veinte (20) dias de plazo al partir de la fecha de la demanda y la notificacion. Hace falta ascentar una comparencia escrita o en persona o con un abogado y entregar a la corte en forma escrita sus defensas o sus objeciones a las demandas en contra de su persona. Sea avisado que si usted no se defiende, la corte tomara medidas y puede continuar la demanda en contra suya sin previo aviso o notificacion. Ademas, la corte puede decidir a favor del demandante y requiere que usted cumpla con todas las provisiones de esta demanda. Usted puede perder dinero o sus propiedades u otros derechos importantes para usted.

*Lleve esta demanda a un abogado immediatamente. Si no tiene abogado o si no tiene el dinero suficiente de pagar tal servicio. Vaya en persona o llame por telefono a la oficina cuya direccion se encuentra escrita abajo para averiguar donde se puede conseguir asistencia legal.*

**Asociacion De Licenciados
De Filadelfia
Servicio De Referencia E
Informacion Legal
One Reading Center
Filadelfia, Pennsylvania 19107
(215) 238-6333
TTY (215) 451-6197**

2

Case ID: 211202070

**SAUL EWING ARNSTEIN & LEHR LLP**
Amy S. Kline, Pa. Bar ID # 84690
Jennifer L. Beidel, Pa. Bar ID # 204450
Centre Square West, 38th Floor
1500 Market Street
Philadelphia, Pennsylvania 19102-2186
Telephone: (215) 972-7180
Fax: (215) 972-1917
Amy.Kline@saul.com
Jennifer.Beidel@saul.com
*Attorneys for Plaintiff*

**NOTICE TO PLEAD**
**To Defendant:**
You are hereby notified to file a written
response to the enclosed Verified Complaint
within twenty (20) days from service hereof,
or a judgment may be entered against you.
*/s/ Jennifer L. Beidel*
Jennifer L. Beidel, Esquire

*Attorneys for Plaintiff Delaware River*
*Waterfront Corporation*

---

## IN THE COURT OF COMMON PLEAS OF PHILADELPHIA COUNTY
## FIRST JUDICIAL DISTRICT OF PENNSYLVANIA

|  |  |  |
|---|---|---|
| DELAWARE RIVER WATERFRONT CORPORATION, | : | CIVIL DIVISION |
|  | : |  |
| Plaintiff, | : | CIVIL ACTION |
|  | : |  |
| v. | : |  |
|  | : | NO.   211202070 |
| THE SAGE GROUP PLC and WELLSPRING SOFTWARE, INC. d/b/a PRINTBOSS, | : | |
|  | : |  |
|  | : | JURY TRIAL DEMANDED |
| Defendants. | : |  |

---

## <u>VERIFIED COMPLAINT</u>

Plaintiff Delaware River Waterfront Corporation ("DRWC"), for its Verified Complaint

against Defendants The Sage Group plc ("Sage") and Wellspring Software, Inc. d/b/a PrintBoss

("Wellspring") (collectively, "Defendants"), alleges as follows:

Case ID: 211202070

## PRELIMINARY STATEMENT

1.      This action seeks recovery of funds lost due to Defendants' negligence and misrepresentations regarding the security and accuracy provided by their software.

2.      Between January 2013 and October 2019, Defendants' accounting software permitted DRWC's former Accounting Administrator, Angela Sabatine ("Sabatine"), to cash at least 318 checks that were drawn on a DRWC account and made payable to Sabatine. On information and belief, Sabatine was able to carry out her scheme using Defendants' software, which allowed her to alter checks after being created within the software and to conceal the transactions from DRWC using valid vendor information.

3.      As a direct consequence of Defendants' negligence and misrepresentations regarding the capabilities of their software, Sabatine was able to embezzle over $2.4 million in funds from DRWC.

4.      In February 2022, Sabatine pleaded guilty to wire fraud, bank fraud, and identity theft charges in connection with her embezzlement from DRWC.  Sabatine has not yet been sentenced.

5.      Defendants' negligence and misrepresentations have caused DRWC to suffer direct pecuniary losses and other consequential damages due to Sabatine's unchecked ability to issue checks improperly and receive funds to which she was not entitled.

6.      DRWC seeks compensatory damages against Defendants for their failure to adhere to the proper standard of care in designing and marketing their products and misrepresenting the capabilities of their products, which has resulted in substantial losses for DRWC over a period of years.

Case ID: 211202070

## PARTIES AND RELATED INDIVIDUALS

7.      Plaintiff DRWC is a Pennsylvania non-profit development corporation, and has its principal place of business at 121 N. Columbus Boulevard, Philadelphia, PA 19106. The fundamental purpose of DRWC is to design, develop, and manage the central Delaware River Waterfront in Philadelphia between Oregon and Allegheny Avenues. DRWC's mission is to transform the central Delaware River Waterfront into a vibrant destination for recreational, cultural, and commercial activities for Philadelphia residents and visitors.

8.      Defendant Sage is a Virginia corporation with its principal place of business at 271 17th Street NW, Suite 1100, Atlanta, GA 30363.

9.      Defendant Wellspring is a Missouri corporation with its principal place of business at 445 Sovereign Ct., Manchester, MO 63011.

10.     Sabatine was the Accounting Administrator for DRWC from at least 1999 through November 1, 2019. Sabatine's responsibilities at DRWC included issuance of checks to vendors for accounts payable.

## JURISDICTION AND VENUE

11.     This Court has jurisdiction over this action pursuant to 42 Pa. C.S. § 931.

12.     Pursuant to Pennsylvania Rules of Civil Procedure 1006(b), 1006(c)(1), 2156(a), and 2179(a)(2) & (3), venue is proper because Defendants regularly conduct business in Philadelphia County, Pennsylvania, and the matters giving rise to this Complaint occurred in Philadelphia County, Pennsylvania.

Case ID: 211202070

## SAGE AND PRINTBOSS SOFTWARE

13.     Sage owns and markets a software program called "Sage 300cloud" that allows

users of the software to, among other things, set up and maintain a general ledger within the

program, generate financial reports, set up and maintain vendor accounts, enter or import

transactions from various sources, print checks, and detect unrecorded transactions with bank

reconciliations.

14.     Wellspring owns and markets a product called "PrintBoss" that integrates with

Sage 300cloud products to receive vendor information from Sage 300cloud, pair that information

with the correct bank information for a vendor, and allow purchasers to print checks payable to

that vendor.

15.     Wellspring's website states: "User permissions, encrypted bank information, and

electronic signatures make your payments secure. Feel safe knowing PrintBoss is a trusted Sage

Endorsed Partner." *See* https://www.printboss.com/printboss-software/printboss-for-sage (last

visited April 14, 2022).

16.     In or around 1996, DRWC utilized a program called ACCPAC, a predecessor

software to Sage 300cloud that had a substantially similar purpose and functionality as Sage

300cloud.

17.     Upon information and belief, Sage acquired the ACCPAC program in 2004 and

DRWC thereafter contracted with Sage to utilize ACCPAC and ACCPAC's successor programs,

up to and including Sage 300cloud. Sage 300cloud and its predecessor software versions licensed

from Sage by DRWC will be referred to collectively as "the Sage Software."

18.     Through the date of this filing, DRWC has annually renewed its license with Sage

for the Sage Software.

6

Case ID: 211202070

19.     From time to time, the license agreement distributed by Sage has been updated.  A copy of the license agreement that currently appears when users of Sage 300cloud open the program, the Sage End User License Agreement ("Sage License Agreement), which is undated, is attached hereto at Ex. A.

20.     After a diligent search of DRWC's records, DRWC does not believe that it has possession of any other agreements from Sage regarding the Sage Software.

21.     In the marketing materials for Sage 300cloud, which were distributed to DRWC when it most recently renewed its license, Sage states that Sage 300cloud will "[d]etect unrecorded transactions and correct differences between your books and your bank account." *See, e.g.,* Sage 300cloud: Manage Your Company with One Powerful Financial Tool at p. 2, Ex. B.

22.     Upon information and belief, the representations made in the Sage marketing materials regarding Sage 300cloud are substantially similar to the representations made by Sage to DRWC regarding the Sage Software since at least 2012.

23.     Nowhere in the Sage marketing materials or Sage License Agreement does Sage state that the Sage Software allows users to modify invoices and purchase order information to conceal unauthorized transactions.

24.     Upon information and belief, Sage has never communicated to DRWC that the Sage Software allows users to modify invoices and purchase order information to conceal unauthorized transactions.

25.     The Sage Software, in conjunction with PrintBoss, also allows users to create checks.

Case ID: 211202070

26.     Nowhere in the Sage marketing materials or Sage License Agreement does Sage state that the Sage Software allows users to export checks to other software programs, like Microsoft Word, that allow the checks to be altered.

27.     The Sage License Agreement expressly disclaims any express or implied warranties, including any warranties of merchantability.  *See* Ex. A § 5.4.

28.     The disclaimers of warranties in the Sage License Agreement are not consistent with the representations and omissions made by Sage in marketing the Sage Software, including its representation that the software would "[d]etect unrecorded transactions and correct differences between your books and your bank account," and its omission of the fact that checks created with the software could be exported to Microsoft Word and altered.

29.     In or around 1999, DRWC contracted with Wellspring to license PrintBoss software compatible with the Sage Software.

30.     Through the date of this filing, DRWC has annually renewed its license with Wellspring for PrintBoss.

31.     From time to time, the license agreement distributed by Wellspring for PrintBoss has been updated.  A copy of the license agreement that currently appears when users of PrintBoss open the program, the PrintBoss Software License Agreement ("PrintBoss License Agreement"), which is undated, is attached hereto at Ex. C.

32.     After a diligent search of DRWC's records, DRWC does not believe that it has possession of any other agreements from Wellspring regarding PrintBoss.

33.     In Wellspring's marketing materials for PrintBoss, which were distributed to DRWC when DRWC most recently renewed its license, Wellspring repeatedly markets the security that PrintBoss software offers.  It states:

8

Case ID: 211202070

a.      that PrintBoss can be used to "print security verified signatures";

b.      "Printboss – Print with <u>Quality</u> and <u>Security</u>!" in purple font larger than the surrounding text (emphasis in original);

c.      "Check printing made easy and secure . . ." in orange font larger than the surrounding text;

d.      "Either a password or a diskette makes the signature secure"; and

e.      "All Wellspring Software check stock is Toner Grip paper because writing a check should never expose your money to easy fraud." *See* Add PrintBoss to your accounting software, Ex. D.

34.     Upon information and belief, the representations made in the current Wellspring marketing materials regarding PrintBoss are substantially similar to the representations made by Wellspring to DRWC regarding PrintBoss since at least 2012.

35.     Nowhere in the marketing materials or PrintBoss License Agreement does Wellspring state that PrintBoss allows users to export checks into software like Microsoft Word that allows the checks to be altered.

36.     Upon information and belief, Wellspring has never stated that PrintBoss allows users to export checks into software like Microsoft Word that allows the checks to be altered.

37.     The PrintBoss License Agreement includes a "Disclaimer of Warranties"  that disclaims all express or implied warranties, including implied warranties of merchantability and fitness for a particular purpose.  See Ex. D.

38.     The warranty disclaimer in the PrintBoss License Agreement is not consistent with the representations and omissions made by Wellspring, including its representation that it

9

Case ID: 211202070

securely prints checks and its omission of the fact that it allows users to export checks to software programs like Microsoft Word that allow checks to be altered.

## SABATINE'S EMBEZZLEMENT

39.     At all relevant times, DRWC used the Sage Software as its accounts payable software system, along with PrintBoss to print checks. To issue a check payable to a DRWC vendor, an authorized operator would enter a purchase order into the Sage Software ("the Purchase Order"). Typically, that Purchase Order would correspond to an invoice that was provided by the vendor to DRWC, whether in paper or electronic form ("the Vendor Invoice").

40.     Prior to September 2017, only Sabatine and two other DRWC employees had access to the Sage Software at DRWC.  Anusha Gopalan ("Gopalan"), the DRWC Finance Manager who eventually assumed many of Sabatine's duties after her termination, gained the Sage Software access as of September 2017. In 2018, additional staff members were given very limited electronic access to a Sage module to input purchase order requests to be routed for approval.

41.     At all relevant times, Sabatine had the ability to remotely connect to DRWC's systems through an application called "logmein" and had VPN access to the Sage Software.

42.     Effective November 1, 2019, Sabatine's employment with DRWC was terminated for poor work performance pursuant to a Separation Agreement and General Release.

43.     In or about January 2020, Gopalan discovered irregularities in an accounts payable account held at TD Bank that Sabatine had previously administered ("the Account").

44.     Gopalan elevated her concerns to DRWC's Vice President of Finance and Human Resources, Rinku Modi ("Modi"), and DRWC's President, Joe Forkin ("Forkin"), who launched an internal investigation.

10

Case ID: 211202070

45.     The authorized signers for the Account were Forkin, Modi, and two other DRWC employees.  Sabatine was never a signer on the Account.

46.     Based on DRWC's Purchase Order and Check Approval/Signing Policy, checks from the Account for $1,001 and over required two signatures.

47.     A review of bank statements for the Account shows that more than $2.4 million of unauthorized checks were made payable to Sabatine between 2013 and 2019 ("the Checks").

48.     A review of the Checks and the Sage Software system reveals the following:

a.     The Sage Software and/or PrintBoss were used to issue at least 318 unauthorized checks payable to Sabatine, totaling more than $2.4 million, between January 2013 and October 2019.

b.     Each of those approximately 318 checks was booked into DRWC's system as having been paid to a legitimate DRWC vendor. As a result, the Checks appear in the Accounts Payable Vendor Transaction reports pertaining to various legitimate vendors.

c.     At least 43 legitimate vendor accounts ("the Vendors") were utilized in the scheme.

d.     Each of the Vendors provided services for DRWC on an irregular basis, such that irregularities in payment to the Vendors would be difficult to spot.

e.     For all of the Checks, there is a corresponding Purchase Order.

f.     For at least 50 of the Checks, there is a Purchase Order and an altered Vendor Invoice with metadata tracing back to Sabatine's computer, specifically, to "Desktop Computer – Asabatine\Documents" ("the Altered Vendor Invoices").

g.     On the Altered Vendor Invoices, the invoice number, invoice date, transaction text, line amount, and totals appear in different font than other text on the same

11

Case ID: 211202070

invoices and other text on legitimate invoices to the same vendor. Other information on the Altered Vendor Invoices, including sales order number and a portion of the project name, appears to have been whited out.

> h.     The Checks were deposited into Sabatine's personal bank account at PNC with account number ending in -6623, which is the same account that Sabatine used to receive her direct deposit of wages from DRWC while she was employed there.

> i.     The Checks are typically in amounts just shy of $10,000 and are typically in uneven amounts.

49.     Two of the authorized signers on the Account, Forkin and Modi, have reviewed the Checks and determined that their signatures are forged on the Checks.

50.     A review of the signature cards for the Account confirms that the signatures are forgeries.

51.     One of the Vendors, Waste Management, confirmed that the Checks did not correspond to work they performed for DRWC and that they neither requested nor authorized the issuance of the Checks.

52.     In February 2022, Sabatine pleaded guilty to wire fraud, bank fraud, and identify theft charges in connection with her embezzlement from DRWC.  Sabatine has not yet been sentenced.

<u>**SAGE AND PRINTBOSS PERMITTED THE SCHEME TO OCCUR**</u>

53.     After Sabatine's embezzlement was discovered, Charles Green from Kastech Consulting, Inc., DRWC's technical consultant for Sage, confirmed that there was a loophole within that would allow a Sage Software user to convert a Sage-issued check to Word format, change the payee, and print the check with the altered payee, while still preserving the original

Case ID: 211202070

payee within DRWC's accounting and vendor management records. Green has since identified and detailed additional methods by which Sabatine could have embezzled using the Sage Software.

54.     The Sage Software allowed Sabatine to input legitimate vendor and invoice information in DRWC's accounting software to evade detection by DRWC, and later export the generated checks to Microsoft Word for altering to suit her scheme.

55.     The Sage Software also allowed Sabatine to print multiple checks with the same check number.

56.     The Sage Software and Printboss also allowed Sabatine to export checks to another software program, namely, Microsoft Word, in which she could alter the checks in any way, like changing the payee from a legitimate vendor to herself.  Because Sabatine made these edits post-export to Microsoft Word, the edits did not tie back into DRWC's accounting software and vendor internal controls, permitting Sabatine to evade detection.

57.     Rather than detecting unrecorded transactions and correcting differences between DRWC's books and bank account as warranted, the Sage Software was actually used by Sabatine to create and hide unrecorded transactions.

58.     Sage's representation that the Sage Software would "detect unrecorded transactions and correct differences between your books and your bank account" lulled DRWC into believing that the transactions recorded in Sage were accurate for nearly eight years when in fact Sabatine had been embezzling millions of dollars using a Sage and PrintBoss loophole.

59.     Rather than securely printing checks and preventing fraud, as Wellspring warranted, PrintBoss allowed Sabatine to create unauthorized checks made out to her personal account.

Case ID: 211202070

60.     Wellspring's warranty that PrintBoss would secure the check printing process lulled DWRC into believing that the transactions recorded in the Sage Software were accurate for nearly eight years when in fact Sabatine had been embezzling millions of dollars.

### COUNT I – NEGLIGENCE
### (Plaintiff DRWC v. Defendant Sage)

61.     DRWC incorporates by reference all prior Paragraphs of this Verified Complaint as if fully set forth here.

62.     Sage created and marketed the Sage Software in order to allow businesses to manage and track their financial transactions accurately.

63.     Sage had a duty to DRWC to design and market the Sage Software with the care that an ordinarily prudent person would take under similar circumstances.

64.     Sage breached its duty to DRWC in several ways, including but not limited to the following:

a.     Designing the Sage Software in a manner that allows users to create and print unauthorized checks;

b.     Designing the Sage Software in a manner that, when used in conjunction with PrintBoss, allows users to create and print unauthorized checks,

c.     Designing and creating the Sage Software in a manner that failed to notify DRWC, as the licensor of the product, that the product was being used to create and print unauthorized checks;

d.     Designing the Sage Software in a manner that allows users to create checks for non-existent or materially altered invoices; and

14

Case ID: 211202070

e.    Marketing the Sage Software in a manner that assured DRWC that the products would detect unauthorized transactions on the account, when in fact the software itself allowed users to create and conceal unauthorized transactions.

65.    Sage's breaches caused Sabatine to be able to issue unauthorized checks payable to herself.

66.    Sage's breaches caused Sabatine's unauthorized transactions to be concealed from DRWC.

67.    Sage's breaches caused DRWC to be unaware that Sabatine could use the Sage Software to issue checks to herself.

68.    As a result of Sage's breaches, DRWC has sustained damages in excess of $50,000.

WHEREFORE, Plaintiff demands judgment in favor of DRWC against Defendant Sage in an amount in excess of $50,000 and other such relief as the court may deem just and proper.

## COUNT II – NEGLIGENCE
### (Plaintiff DRWC v. Defendant Wellspring)

69.    DRWC incorporates by reference all prior Paragraphs of this Verified Complaint as if fully set forth here.

70.    Defendant Wellspring created and marketed PrintBoss software to allow customers to securely print checks.

71.    Wellspring had a duty to DRWC to design and market PrintBoss with the care that an ordinarily prudent person would take under similar circumstances.

72.    Wellspring breached its duty to DRWC in several ways, including but not limited to the following:

15

Case ID: 211202070

a.      Designing PrintBoss in a manner that allows users to create and print unauthorized checks;

b.      Designing PrintBoss in such a manner that, when used in conjunction with the Sage Software, allows users to create and print unauthorized checks;

c.      Designing and creating PrintBoss in a manner that fails to notify DRWC, as the licensor of the product, when the product is being used to create and print unauthorized checks; and

d.      Marketing PrintBoss in a manner that assures DRWC that the products would securely print checks and prevent fraud, when in fact the software itself allowed Sabatine to create unauthorized checks made out to her personal account.

73.     Wellspring's breaches caused Sabatine to be able to issue unauthorized checks payable to herself.

74.     Wellspring's breaches caused Sabatine's unauthorized transactions to be concealed from DRWC.

75.     Wellspring's breaches caused DRWC to be unaware that Sabatine could use PrintBoss to issue checks to herself.

76.     As a result of Wellspring's breaches, DRWC has sustained damages in excess of $50,000.

WHEREFORE, Plaintiff demands judgment in favor of DRWC against Defendant Wellspring in an amount in excess of $50,000 and other such relief as the court may deem just and proper.

Case ID: 211202070

## COUNT III – FRAUDULENT MISREPRESENTATION
### (Plaintiff DRWC v. Defendant Sage)

77.     DRWC incorporates by reference all prior Paragraphs of this Verified Complaint as if fully set forth herein.

78.     As discussed above, Sage represented in its marketing materials that the Sage Software could "[d]etect unrecorded transactions and correct differences between your books and your bank account."

79.     Sage omitted to state that the Sage Software could be used to create unauthorized transactions.

80.     While Sage stated that users could use the Sage Software to print checks, Sage omitted to state that users could export checks from the Sage Software into other software that would allow the checks to be altered, using PrintBoss or otherwise.

81.     Sage's representations that the Sage Software could be used to detect unrecorded transactions was material to the transaction; it is essential to DRWC that it keeps accurate books and records and prevents fraud within its own organization.

82.     Sage's omission to state that users could export checks from the Sage Software into other software that would allow the checks to be altered was material to the transaction; had DRWC known that such a feature existed, it either would not have purchased or renewed the software license or would have added additional internal controls to safeguard against the export feature.

83.     The Sage Software, in fact, allowed checks to be exported to other software that would allow checks to be altered, thereby allowing users to issue unauthorized checks.

Case ID: 211202070

84.     Sage omitted to state that the Sage Software could be used to export checks to other software that would allow checks to be altered when it knew or should have known, or had reckless disregard for whether, or was grossly negligent regarding the fact that the Sage Software would allow such an action.

85.     Sage represented that the Sage Software would detect unrecorded transactions when it knew or should have known, or had reckless disregard for whether, or was grossly negligent regarding the fact that the software in fact allows users to create unauthorized transactions by altering invoice and purchase order information to match the fraudulent checks, thereby concealing the transactions within the program.

86.     Sage's statements and omissions cited above regarding the Sage Software were intentionally made to mislead consumers into purchasing and renewing the software.

87.     DRWC relied on Sage's statements and omissions cited above in purchasing and renewing the Sage Software.

88.     As a  result of its reliance on Sage's statements, DRWC purchased and renewed the Sage Software with the understanding that it would not allow the creation and concealment of unauthorized transactions, and would not allow users to export checks into other software programs for alteration, when in fact it allowed Sabatine to enact and conceal her check-cashing scheme.

WHEREFORE, Plaintiff demands judgment in favor of DRWC against Defendant Sage in an amount in excess of $50,000 and other such relief as the court may deem just and proper.

Case ID: 211202070

## COUNT IV – FRAUDULENT MISREPRESENTATION
**(Plaintiff DRWC v. Defendant Wellspring)**

89.    DRWC incorporates by reference all prior Paragraphs of this Verified Complaint as if fully set forth herein.

90.    As discussed above, Wellspring made repeated representations in its marketing materials regarding the security offered by its PrintBoss software.

91.    Wellspring omitted to state that PrintBoss would allow checks to be exported to other programs in which the checks could be altered.

92.    Wellspring's representations of enhanced security were material to the transaction.  As discussed above, Wellspring specifically marketed enhanced security as one of PrintBoss's primary functions.

93.    PrintBoss in fact allowed checks to be exported to other software that would allow checks to be altered, thereby eliminating and contravening any purported security measures within the PrintBoss program.

94.    Wellspring made its statements regarding the security of its software with knowledge that the software in fact allowed checks to be exported to other software that would allow checks to be altered, or with reckless disregard or gross negligence as to whether the software allowed checks to be exported to other programs in which they could be altered.

95.    Wellspring's statements regarding the security of PrintBoss software were made intentionally to mislead consumers into purchasing the software.

96.    DRWC relied on Wellspring's statements regarding the security offered by PrintBoss.

Case ID: 211202070

97.     As a  result of its reliance on Wellspring's statements, DRWC purchased
PrintBoss with the understanding that it would be secure, when in fact it allowed Sabatine to
enact her check-cashing scheme.

WHEREFORE, Plaintiff demands judgment in favor of DRWC against Defendant
Wellspring in an amount in excess of $50,000 and other such relief as the court may deem just
and proper.

## COUNT V – NEGLIGENT MISREPRESENTATION
### (Plaintiff DRWC v. Defendant Sage)

98.     DRWC incorporates by reference all prior Paragraphs of this Verified Complaint
as if fully set forth herein.

99.     As discussed above, Sage represented in its marketing materials that the Sage
Software could "[d]etect unrecorded transactions and correct differences between your books
and your bank account."

100.    Sage omitted to state that the Sage Software could be used to create unauthorized
transactions.

101.    While Sage stated that users could use the Sage Software to print checks, Sage
omitted to state that users could export checks from the Sage Software into other software that
would allow the checks to be altered, using PrintBoss or otherwise.

102.    Sage's representations that it could be used to detect unrecorded transactions was
material to the tranasaction; it is essential to DRWC that it keeps accurate books and records and
prevents fraud within its own organization.

103.    Sage's omission to state that users could export checks from the Sage Software
into other software that would allow the checks to be altered was material to the transaction; had

Case ID: 211202070

DRWC known that such a feature existed, it either would not have purchased or renewed the software or would have added additional internal controls to safeguard against the export feature.

104.    The Sage Software, in fact, allowed checks to be exported to other software that would allow checks to be altered, thereby allowing users to issue unauthorized checks.

105.    Sage omitted to state that the Sage Software could be used to export checks to other software that would allow checks to be altered when it knew that the Sage Software would allow such an action.

106.    Sage represented that the Sage Software would detect unrecorded transactions when it knew or should have known that the Sage Software in fact allows users to create unauthorized transactions by altering invoice and purchase order information to match the fraudulent checks, thereby concealing the transactions within the program.

107.    Sage's statements and omissions cited above regarding the Sage Software were made intentionally to mislead consumers into purchasing and renewing the software.

108.    DRWC relied on Sage's statements and omissions cited above in purchasing and renewing the Sage Software.

109.    As a  result of its reliance on Sage's statements, DRWC purchased the Sage Software with the understanding that it would not allow the creation and concealment of unauthorized transactions, and would not allow users to export checks into other software programs for alteration, when in fact it allowed Sabatine to enact and conceal her check-cashing scheme.

WHEREFORE, Plaintiff demands judgment in favor of DRWC against Defendant Sage in an amount in excess of $50,000 and other such relief as the court may deem just and proper.

Case ID: 211202070

## COUNT VI – NEGLIGENT MISREPRESENTATION
### (Plaintiff DRWC v. Defendant Wellspring)

110.    DRWC incorporates by reference all prior Paragraphs of this Verified Complaint as if fully set forth herein.

111.    As discussed above, Wellspring made repeated representations in its marketing materials regarding the security offered by its PrintBoss software.

112.    Wellspring omitted to state that PrintBoss would allow checks to be exported to other programs in which the checks could be altered.

113.    Wellspring's representations of enhanced security were material to the transaction.  As discussed above, Wellspring specifically marketed enhanced security as one of PrintBoss's primary functions.

114.    PrintBoss in fact allowed checks to be exported to other software that would allow checks to be altered, thereby eliminating and contravening any purported security measures within the PrintBoss program.

115.    PrintBoss, in fact, allowed signatures to be forged on the Checks by contravening internal controls around vendor management and dual signature check requirements.

116.    Wellspring made its statements regarding the security of its software when it knew or should have known that the software in fact allowed checks to be exported to other software that would allow checks to be altered.

117.    Wellspring made its statements regarding the security of its software when it knew or should have known that the software in fact allowed signatures on checks to be forged in ways that would not be caught be existing internal controls within accounting and vendor software.

22

Case ID: 211202070

118.    Wellspring's statements regarding the security of PrintBoss software were made intentionally to mislead consumers into purchasing the software.

119.    DRWC relied on Wellspring's statements regarding the security offered by PrintBoss.

120.    As a  result of its reliance on Wellspring's statements, DRWC purchased PrintBoss with the understanding that it would be secure, when in fact it allowed Sabatine to enact her check-cashing scheme.

WHEREFORE, Plaintiff demands judgment in favor of DRWC against Defendant Wellspring in an amount in excess of $50,000 and other such relief as the court may deem just and proper.

## **JURY DEMAND**

Plaintiff demands a trial by jury on all matters triable by jury.

Dated: April 18, 2022

**SAUL EWING ARNSTEIN & LEHR LLP**
By:   */s/ Jennifer L. Beidel*

Jennifer L. Beidel, Esq. (Pa. Bar ID # 204450)
Amy S. Kline, Esq. (Pa. Bar ID # 84690)
Centre Square West, 38th Floor
1500 Market Street
Philadelphia, Pennsylvania 19102-2186
Telephone: (215) 972-7850
Fax: (215) 972-2291
Jennifer.Beidel@saul.com
Amy.Kline@saul.com

*Attorneys for Plaintiff Delaware River Waterfront Corporation*

23

Case ID: 211202070

**SAUL EWING ARNSTEIN & LEHR LLP**
Amy S. Kline, Pa. Bar ID # 84690
Jennifer L. Beidel, Pa. Bar ID # 204450
Centre Square West, 38th Floor
1500 Market Street
Philadelphia, Pennsylvania 19102-2186
Telephone: (215) 972-7180
Fax: (215) 972-1917
Amy.Kline@saul.com
Jennifer.Beidel@saul.com
*Attorneys for Plaintiff*

---

## IN THE COURT OF COMMON PLEAS OF PHILADELPHIA COUNTY
## FIRST JUDICIAL DISTRICT OF PENNSYLVANIA

---

|  |  |  |
|---|---|---|
| DELAWARE RIVER WATERFRONT CORPORATION, | : : : | CIVIL DIVISION |
| Plaintiff, | : : | CIVIL ACTION |
| v. | : : | NO.  211202070 |
| THE SAGE GROUP PLC and WELLSPRING SOFTWARE, INC. d/b/a PRINTBOSS, | : : : : | JURY TRIAL DEMANDED |
| Defendants. | : | |

---

### CERTIFICATE OF SERVICE

I, Jennifer L. Beidel, Esquire, hereby certify that a true and correct copy of Plaintiff Delaware River Waterfront Corporation's Verified Complaint, has been served upon all counsel of record via email as follows:

Mary Kay Brown, Esq.
Jami B. Nimeroff, Esq.
Brown McGarry Nimeroff LLC
Two Penn Center, Suite 610
1500 JFK Blvd.
Philadelphia, PA 19102

24

Case ID: 211202070

mkbrown@bmnlawyers.com
jnimeroff@bmnlawyers.com

*Attorneys for Defendant The Sage Group plc*

Robyn D. Kazatsky, Esq.
Lock Gordon Law Group, LLC
18 Campus Blvd., Suite 100
Newtown Square, PA 19073
rkazatsky@lockgordon.com

*Attorney for Defendant Wellspring Software, Inc. d/b/a PrintBoss*

Dated: April 18, 2022         **SAUL EWING ARNSTEIN & LEHR LLP**

By: */s/ Jennifer L. Beidel*
Jennifer L. Beidel, Esq. (Pa. Bar ID # 204450)
Amy S. Kline, Esq. (Pa. Bar ID # 84690)
Centre Square West, 38th Floor
1500 Market Street
Philadelphia, Pennsylvania 19102-2186
Telephone: (215) 972-7850
Fax: (215) 972-2291
Jennifer.Beidel@saul.com
Amy.Kline@saul.com

*Attorneys for Plaintiff Delaware River Waterfront Corporation*

25

Case ID: 211202070

## <u>VERIFICATION</u>

Joseph A. Forkin is President of Plaintiff Delaware River Waterfront Corporation and hereby verifies that the facts set forth in the foregoing **Verified Complaint** are true and correct to the best of the signer's knowledge, information and belief.  To the extent that the Verified Complaint contains averments that are inconsistent in fact, the signer has been unable, after reasonable investigation, to ascertain which of the inconsistent averments are true, but the signer has knowledge or information sufficient to form a belief that one of them is true.  The signer understands that the statements herein are made subject to the penalties of 18 Pa. C.S.A. § 4904 relating to unsworn falsification to authorities.

Date:  April 18, 2022

_____
Joseph A. Forkin
President
Delaware River Waterfront Corporation

39925738.1

Case ID: 211202070



*Filed and Attested by the*
*Office of Judicial Records*
*18 APR 2022 07:30 pm*
*E. HAURIN*

# EXHIBIT A

Case ID: 211202070

# Sage End User License Agreement

This Agreement governs the use of the Software set forth in Customer's Order Form and any Service Plan Customer elects to purchase with respect to that Software.

**BY DOING ONE OR MORE OF THE FOLLOWING (OR ALLOWING OR AUTHORIZING A THIRD PARTY TO DO SO ON CUSTOMER'S BEHALF), CUSTOMER SHALL BE DEEMED TO HAVE ACCEPTED AND ENTERED INTO THIS AGREEMENT WITH SAGE AND ANY ADDITIONAL TERMS AND CONDITIONS REQUIRED BY THIRD-PARTY PROVIDERS BY: (1) CLICKING "AGREE," "OK", OR A SIMILAR AFFIRMATION THAT APPEARS DURING ACTIVATION OF THE SOFTWARE OR PRIOR TO THE USE OF THE SOFTWARE, (2) SIGNING THIS AGREEMENT, OR (3) USING THE SOFTWARE.  IF CUSTOMER DOES NOT AGREE TO BE LEGALLY BOUND BY THIS AGREEMENT OR ANY APPLICABLE TERMS AND CONDITIONS REQUIRED BY THIRD-PARTY PROVIDERS, EACH IN THEIR ENTIRETY AND WITHOUT MODIFICATION OR ADDITION, THEN CUSTOMER DOES NOT HAVE A LICENSE TO USE THE SOFTWARE.**

**BY ACCEPTING THIS AGREEMENT, CUSTOMER CONSENTS TO THE TRANSMISSION OF CERTAIN INFORMATION DURING ACTIVITATION AND DURING ITS USE OF THE SOFTWARE TO SAGE PURSUANT TO THE SAGE PRIVACY NOTICE DESCRIBED IN SECTION 11.**

## 1.   Definitions

"Affiliate" means any entity that directly or indirectly controls, is controlled by, or is under common control with, the subject entity, where 'control' is the direct or indirect ownership or control of at least a majority of the voting rights in the entity, or otherwise the power to direct the management and policies of the entity.  An entity is an Affiliate only so long as such control continues.

"Agreement" means this Sage End User License Agreement, the Supplemental License Terms, and all applicable Order Forms, each of which are incorporated herein by reference and made a part hereof.

"Customer" means the legal entity listed on the Order Form.

"Customer Support" means Software assistance that Customer receives by phone, email, chat, access to on-line information, or by similar means because Customer purchased a Service Plan.

"Documentation" means the Program specifications that are set forth in the Program help files and any release-related notes, guides, or manuals Sage publishes specific to the current version of the Program.

"Enabled Use" means that Sage has fulfilled the applicable software delivery process (enabling downloading of the Software, delivering activation codes for the Software, or otherwise), thereby enabling Customer to install and execute the Program.

"Maintenance Software" means Software that Sage delivers because Customer has purchased a Service Plan.

"Order Form" means any order form issued by Sage or an authorized reseller that describes the Software or Service Plan that Customer has elected to purchase and the corresponding fees for such purchase.  Only order forms issued by Sage or an authorized reseller of Sage's Software constitute "Order Forms" under this Agreement.  Customer-issued order forms, purchase orders, or similar documents are not Order Forms and have no force or effect.

"PEP" has the meaning set forth in section 11.1.

"Program" means the Sage application, in object code format, identified in the Order Form, as updated by any Maintenance Software.

"Sage" means (i) Sage Software, Inc., a Virginia corporation with offices at 271 17th Street NW, Suite 1100, Atlanta, Georgia 30363, if you are domiciled in the United States or any country other than Canada, and (ii) Sage Software Canada Ltd., an Alberta corporation with offices at 120 Bremner Blvd., Suite 1500, Toronto, Ontario M5J 0A1, if you are domiciled in Canada.

"Service Plan" means a plan Customer purchases for the provision of Customer Support and/or Maintenance Software for a specified period.

"Software" means collectively, the Program, the Documentation, any Maintenance Software, and any part thereof.

"Supplemental License Terms" means the additional terms and conditions associated with the Software located at <https://www.sage.com/en-us/legal/eula/> (if you are contracting with Sage Software, Inc.) or <https://www.sage.com/en-ca/legal/eula/> (if you are contracting with Sage Software Canada Ltd.), as updated by Sage from time to time in its discretion.

## 2.   License

2.1.   Grant.  Subject to the terms and conditions of this Agreement and Customer's payment of all applicable fees, Sage grants to Customer and its Affiliates a limited, non-exclusive, non-sublicensable, non-transferable (except as expressly permitted herein) license to use the Software.

2.2.   Perpetual or Subscription Licenses.  If Customer purchases a perpetual license, as evidenced by Customer's Order Form, then Customer shall have the right to use the Software for the term of this Agreement.  If Customer purchases a license on a subscription basis, then Customer shall have the right to use the Software for the period stated in Customer's Order Form.

## 3.   Restrictions

3.1.   General.  Sage and its licensors reserve all rights (including all applicable rights under intellectual property laws) not expressly granted in this Agreement.  Further, the license contained in this Agreement does not include the right to, and Customer shall not, do any of the following: (i) make any copy of the Software, except as expressly set forth in section 3.2; (ii) distribute any copy of the Software (whether by renting, leasing, lending, sublicensing, time-sharing, or otherwise); (iii) use the Software for personal, family, household, or other non-business purposes; (iv) alter, modify, translate, decompile, disassemble, or reverse-engineer the Software or create any derivative work thereof; (v) remove or obscure any copyright or trademark notices from the Software; or (vi) use the Software in excess of the limitations set forth in this Agreement or the number and types of users, seats, or licenses purchased.

3.2.   Installations; Copies.  Customer or its Affiliates may only install the Software (i) on a computer system that Customer or its Affiliates own or (ii) only on a computer system not owned by Customer or its Affiliates if Customer or its Affiliates will be the only party with access to the installed Software.  Customer or its Affiliates may make only a reasonable number of backup copies of the Software solely for the purpose of business continuity and disaster recovery and for reinstalling the Software, if reinstallation becomes necessary.  Customer or its Affiliates may make one copy of the Software for use in a testing environment solely for testing purposes.

3.3.   U.S. Government Restricted Rights.  The Software is provided with restricted rights.  Use, duplication or disclosure by the U.S.

Case ID: 211202070

government (including its agencies and instrumentalities) is subject to restrictions set forth in 48 CFR 52.227-19 or DFARS 252.227-7014, as applicable.  The manufacturer is Sage Hibernia Limited for Sage CRM, and Sage Software, Inc. for all other Sage-manufactured products.  The Sage address in the United States is Sage Software, Inc., 271 17th Street, NW, Suite 1100, Atlanta, Georgia 30363.  The Sage address in Canada is Sage Software Canada Ltd., 120 Bremner Blvd., Suite 1500, Toronto, Ontario M5J 0A1, Canada.

3.4.  Report-Writing.  Any report-writing software contained within the Software may be subject to a restriction such that its use may be limited to accessing only the data that is created by, or used by, the Software.

**4.   Fees and Payment**

4.1.  Fees.  Customer shall pay to Sage or its authorized reseller the fees set forth on any Order Form that Customer has signed.  Unless otherwise stated in such an Order Form, all fees are due upon receipt of Sage's invoice.  Once Sage has Enabled Use of the Software, all such fees are non-refundable except as otherwise expressly stated in this Agreement.  Customer acknowledges that Sage may increase its license and other fees (i.e., in subsequent Order Forms) and therefore fees due for new or additional purchases, subscription renewals, or Service Plan renewals may be more than a previous purchase.

4.2.  Automatic Billing.  By subscribing to the Software or electing to utilize a recurring payment plan, Customer authorizes Sage to automatically charge Customer's credit card or bank account on file on a monthly or annual basis, as set forth in any Order Form that Customer has signed, until Customer terminates this Agreement.  Customer is responsible for providing Sage with its most current billing information.

4.3.  Unpaid Uses.  Use of the Software in excess of the number and type of licenses purchased constitutes a material breach of this Agreement.  Customer shall pay to Sage or its authorized reseller the additional license or subscription fees due for the unpaid use calculated in accordance with the applicable Sage retail price list in effect at the time payment is made.  Any failure to make the foregoing payment within 30 days of the invoice date is also a material breach of this Agreement.

4.4.  Late Payment; Non-Payment.  If Sage or its authorized reseller does not receive any fees owed by the specified due date, those fees shall accrue interest at the lower of 1.5% per month or the maximum rate permitted by law.  Non-payment of any fees or of any other amounts due to Sage or an authorized reseller is a material breach of this Agreement.

**5.   Warranties**

5.1.  Software.  Sage warrants that, during the 180-day period (the "Software Warranty Period") that commences on the date that Sage Enabled Use of the Software (whether for an initial license purchase or for Maintenance Software), the Software, when properly used, shall perform substantially in accordance with the Documentation.  Sage warrants that, at all times, the Software shall be free of any harmful or malicious code.  Sage does not otherwise warrant or represent that Customer's use of the Software will be uninterrupted or error-free.  If Customer reports to Sage in writing within the Software Warranty Period any nonconformity between the Documentation and the Software (a "Warranty Claim"), and if Sage is able to replicate and verify that such nonconformity exists, Sage shall attempt to correct such nonconformity and supply Customer with such correction at no additional cost.  If such efforts are unsuccessful and the nonconformity is material, Customer's sole remedy for a breach of the warranty described in this section 5.1 shall be as follows:  Customer may terminate this Agreement, discontinue use of, and return or destroy all copies of the Software, and Sage will ensure that Customer receives a refund of the fees paid for the Software or the Maintenance Software (as applicable) during the applicable Software Warranty Period.

5.2.  Customer Support.  If Customer is entitled to receive Customer Support as part of a separately purchased Service Plan, Sage warrants that while Customer's Service Plan is in effect and if it has paid all required Service Plan fees, Sage will use qualified personnel to provide Customer Support in a professional manner consistent with industry standards.  Customer's sole remedy under this section 5.2 is limited to Sage's re-performance of the Customer Support services giving rise to Customer's claim.

5.3.  Other Limitations.

5.3.1.  Third-Party Implementations.  Unless Sage has agreed in writing to provide software implementation services to implement the Program at Customer's place of business, Customer is responsible for engaging a qualified party to provide implementation services.  Customer is responsible for independently investigating the skills and qualifications of such party.  Sage shall have no liability whatsoever for any failure associated with such implementation services, even if the party Customer engages is an "authorized" or "certified" reseller, consultant, or installer of Sage products.

5.3.2.  Modifications.  Sage shall not have any liability under these limited warranties for any Software that has been modified, lost, stolen, or damaged by accident, abuse, or misapplication.

5.3.3.  No Other Warranties.  No employee, agent, or representative of Sage, nor any reseller or any other third party, is authorized to make any warranty with respect to the Software, and Customer may not rely on any such purported warranty.

5.4. DISCLAIMER OF ALL OTHER WARRANTIES.  EXCEPT AS EXPRESSLY PROVIDED IN THIS AGREEMENT, THE SOFTWARE IS PROVIDED ON AN "AS IS" BASIS AND IS ONLY FOR COMMERCIAL USE, SUBJECT TO ANY RESTRICTIONS IN THIS AGREEMENT OR THE DOCUMENTATION. SAGE, ON BEHALF OF ITSELF, ITS AFFILIATES, AND ITS LICENSORS, DISCLAIMS TO THE FULLEST EXTENT PERMITTED BY LAW ALL OTHER REPRESENTATIONS, WARRANTIES, AND GUARANTEES, WHETHER EXPRESS, IMPLIED, STATUTORY, OR OTHERWISE, INCLUDING THOSE (I) OF MERCHANTABILITY OR SATISFACTORY QUALITY, (II) OF FITNESS FOR A PARTICULAR PURPOSE, (III) OF NON-INFRINGEMENT AND (IV) ARISING FROM CUSTOM, TRADE USAGE, COURSE OF PRIOR DEALING OR COURSE OF PERFORMANCE. NEITHER SAGE, ITS AFFILIATES, NOR ITS LICENSORS WARRANT THAT CUSTOMER'S USE OF THE SOFTWARE WILL BE UNINTERRUPTED OR ERROR-FREE, OR THAT THE SOFTWARE, DOCUMENTATION, AND/OR THE INFORMATION OBTAINED BY CUSTOMER THROUGH USING THE SOFTWARE WILL MEET CUSTOMER'S REQUIREMENTS OR PRODUCE PARTICULAR OUTCOMES OR RESULTS.  SAGE IS NOT RESPONSIBLE FOR ANY PERFORMANCE ISSUES OR ERRORS WITH THE SOFTWARE THAT ARISE FROM CUSTOMER'S DATA OR ANY THIRD PARTY.  CUSTOMER ACKNOWLEDGES THAT SAGE DOES NOT PROVIDE ANY ACCOUNTING, TAXATION, FINANCIAL, INVESTMENT, LEGAL, OR OTHER ADVICE TO CUSTOMERS, USERS, OR ANY THIRD PARTIES.

**6.   Term and Termination**

6.1.  Commencement.  This Agreement takes effect on the date set forth on the initial Customer-signed Order Form and continues until terminated in accordance with this Agreement.

6.2.  Customer's Termination Rights.

Case ID: 211202070

6.2.1.   <u>Subscription Terminations</u>.  If Customer subscribes to the Software, then Customer may terminate this Agreement at any time by giving Sage 30 days' prior written notice.

6.2.2.   <u>Other Terminations</u>.  If Customer does not subscribe to the Software, then Customer may terminate this Agreement at any time by giving Sage prior written notice.

6.3.  <u>Sage's Termination Rights</u>.  If Customer breaches its obligations under this Agreement (including by not paying any fees when due), then this Agreement shall automatically terminate.

6.4.   <u>Effect of Termination</u>.  Any termination of this Agreement shall result in termination of the licenses granted hereunder.  Further, terminating a subscription may result in the Software reverting to "read-only" mode and the loss of access to any features that require a Service Plan (i.e., Sage Business Care).  If Customer terminates a subscription pursuant to section 6.2.1, then Customer shall receive a refund of any pre-paid but unused fees remaining in its then-current subscription period.  Customer's election to reduce the number of users it has purchased or to deactivate optional modules or features of the Software it has purchased is not a subscription termination under this section and does not entitle Customer to any refund.  Customer shall not receive any refunds for exercising any termination right under section 6.2.2.

6.5.  <u>Survival</u>.  Any provision in this Agreement that when reasonably read as intended to survive the termination of this Agreement shall survive, including without limitation, the disclaimer of warranties in section 5 and limitations of liability in section 8.

## 7.   Indemnification

7.1.   <u>Covered Claims</u>.  Subject to sections 7.2 and 7.3, Sage shall defend Customer and its Affiliates in any third-party claim alleging that the Software infringes or misappropriates the intellectual property rights of a third party and pay any resulting costs and damages finally awarded by a court with respect to any such third-party claim.  If the Software infringes (or Sage reasonably believes it may infringe) a third-party's intellectual property rights, Sage may, at its own expense and option: (i) procure the right for Customer to continue use of the Software; (ii) replace or modify the Software so that it becomes non-infringing without material loss of functionality; or (iii) if (i) and (ii) are not feasible, terminate this Agreement.

If this Agreement is terminated pursuant to the foregoing clause (iii), then Sage shall refund or credit Customer fees as follows.  If Customer has a perpetual license, the refunded or credited fees shall be a pro rata portion of the fees incurred for the purchase of Customer's initial license and all upgrades, which pro rata portion will be determined on the basis of the remaining period of a useful life of (5) five years, where the five-year useful life begins on the date of Customer's initial license purchase.  If Customer has purchased a subscription, the refunded or credited fees shall be the pre-paid but unused fees remaining in the then-current subscription period set forth in Customer's Order Form (starting from the date upon which this Agreement is terminated pursuant to the foregoing clause (iii) through the end of the then-current subscription period).

7.2.   <u>Exceptions</u>.  Sage's obligations under section 7.1 do not extend to any claim (i) arising from the combination of the Software with other elements not under Sage's sole control, or (ii) arising from any part of the Software that Customer, its Affiliates, or any other third party modifies, or that incorporates specifications, designs or formulas that Customer or its Affiliates provides.

7.3.   <u>Indemnification Procedure</u>.  In the event of a potential indemnity obligation under this section 7, Customer shall provide Sage with: (i) prompt written notice of the claim or a known threatened claim, such that Sage's ability to defend the claim is not prejudiced; and (ii) control of, and reasonable assistance in, the defense and settlement of the claim, at Sage's expense.  Sage shall have the right to settle any such claim in Sage's sole discretion and at Sage's expense.

7.4.   <u>Exclusive Remedy</u>.  The indemnification obligations set forth in this section 7 are Sage's sole and exclusive liability and Customer's exclusive remedy for any third-party claim described in this section.

## 8.   Limitation of Liability.

8.1.  <u>No Consequential Damages</u>.  TO THE MAXIMUM EXTENT PERMITTED BY APPLICABLE LAW, NEITHER PARTY SHALL HAVE ANY LIABILITY TO THE OTHER PARTY FOR ANY INDIRECT, SPECIAL, EXEMPLARY, INCIDENTAL, PUNITIVE, OR CONSEQUENTIAL DAMAGES.

8.2.  <u>Limit on Direct Damages</u>.  EXCEPT FOR (I) SAGE'S OBLIGATION WITH RESPECT TO AN INDEMNITY CLAIM, (II) CUSTOMER'S OBLIGATIONS TO PAY FEES UNDER THIS AGREEMENT, OR (III) EITHER PARTY'S LIABILITY RESULTING FROM FRAUD, GROSS NEGLIGENCE, OR WILLFUL MISCONDUCT, NEITHER PARTY'S AGGREGATE LIABILITY SHALL EXCEED (A) THE FEES PAID BY CUSTOMER TO SAGE IN THE 12-MONTH PERIOD IMMEDIATELY PRECEDING THE EVENT GIVING RISE TO THE CLAIM OR (B) THE FEES PAID TO SAGE WITH RESPECT TO CUSTOMER'S INITIAL ORDER FORM, WHICHEVER IS GREATER.

8.3.   <u>Scope</u>.  The exclusions and limitations above apply to all causes of action, whether arising from breach of contract, tort, breach of statutory duty or otherwise, even if such loss was reasonably foreseeable or if one party had advised the other of the possibility of such loss. The parties agree that the allocation of risk in this Agreement is reflected in the level of fees payable under this Agreement.  A party may not circumvent the limitations of liability herein or receive multiple recoveries under this Agreement by bringing separate claims on behalf of its Affiliates.

## 9.   Governing Law & Dispute Resolution

9.1.  <u>Law</u>.  The validity, construction, and application of the Agreement will be governed by the internal laws of (i) the State of Georgia (if you are contracting with Sage Software, Inc.) or (ii) the Province of Ontario (if you are contracting with Sage Software Canada Ltd.), in each case excluding its conflict of laws provisions.

9.2.   <u>Arbitration</u>.  The parties agree to resolve all disputes related to this Agreement by binding individual arbitration before one arbitrator and will not bring or participate in any representative action.  The arbitration shall be administered by JAMS pursuant to its Comprehensive Arbitration Rules and Procedures and in accordance with the Expedited Procedures in those Rules, and shall take place in (i) Atlanta, Georgia (if you are contracting with Sage Software, Inc.) or (ii) Toronto, Ontario (if you are contracting with Sage Software Canada Ltd.).  Any challenge to arbitrability shall be decided by the arbitrator.  Judgment on the arbitration award may be entered in any court having jurisdiction.  In the event a party seeks injunctive relief from a court, the parties consent to the exclusive jurisdiction and venue of the courts located in (i) Atlanta, Georgia (if you are contracting with Sage Software, Inc.) and (ii) Toronto, Ontario (if you are contracting with Sage Software Canada Ltd.).  This section 9.2 shall not apply to Sage's enforcement of Customer's payment obligations or to Sage's enforcement or protection of any of its intellectual property rights.

9.3.  <u>Language</u>.  The parties have expressly requested and required that this Agreement and all other related documents be drawn up in the English language.  *Les Parties conviennent et exigent expressément que ce Contrat et tous les documents qui s'y rapportent soient*

Case ID: 211202070

*rédigés en anglais*.

**10.  Compliance**

10.1.   <u>Sanctions and Restricted Territories</u>.  At all times during the term of this Agreement and Customer's use of the Software, Customer hereby confirms that: (i) it shall conduct its business in compliance with all sanctions laws, regulations and regimes imposed by relevant authorities, including but not limited to the Office of Foreign Assets Control (OFAC), the United Nations, the United Kingdom and the European Union; (ii) neither it nor any of its Affiliates is named on any "denied persons list" (or equivalent targeted sanctions list) in violation of any such sanctions restrictions, laws, regulations or regimes, nor is Customer or any of its Affiliates owned or controlled by a politically exposed person; and (iii) Customer has and shall maintain appropriate procedures and controls in place to ensure and be able to demonstrate its compliance with this section 10.1.  Customer may not permit its users to access or use the Software in violation of any U.S. export or sanctions law or regulation or in any Restricted Territories (as defined below).  Such access and/or use is not permitted by Sage and shall constitute a material breach of this Agreement, and where Sage is aware of or suspects Customer (or any of its users) to be accessing, Using, permitting or otherwise facilitating such access and/or use in any Restricted Territory in breach of such laws or regulations, Sage may immediately suspend Customer's use of the Software to the extent that Sage considers necessary without prior notice, and Sage shall promptly notify Customer of such suspension and investigate any potential breach.  Customer shall promptly notify Sage if it has violated, or if a third party alleges that it has violated, this section 10.1.  If Sage has grounds to suspect that Customer is accessing and/or Using the Software in violation of this section 10.1, Customer shall provide Sage with full cooperation and assistance in respect of such access and/or use of the Software and in respect of Customer's compliance with this section 10.1.  Customer shall indemnify Sage and its Affiliates against any claims, costs, damages, losses, liabilities and expenses (including attorneys' fees and costs) as a result of Customer's (or its users') breach of this section 10.1.  As used in this section 10.1, "Restricted Territories" means (a) Cuba, Iran, North Korea, Sudan, Syria and the territory of Crimea / Sevastopol, and (b) any other country or territory that is subject to sanctions by the United Nations, the European Union, or the U.S.

10.2.   <u>Software Audits</u>.  Upon reasonable prior written notice to Customer and subject to Customer's reasonable and documented information security policies and procedures, Sage may audit Customer's use of the Software to ensure that Customer complies with section 3 (Restrictions).  If an audit reveals that Customer has underpaid fees or owes fees to Sage, Sage will invoice Customer for the underpayment or amount due pursuant to section 4.2 (Unpaid Uses).

**11.  Privacy**

11.1.   <u>Processing of Usage Data</u>.

11.1.1.   <u>PEP</u>.  If Customer has not previously opted out of participating in Sage's Product Enhancement Program ("PEP") Customer may automatically be enrolled in PEP when it installs the Program.  Customer may disable PEP during its use of the Software.  Through PEP, Sage may collect information on Customer's hardware and when Customer installs the Software, and how Customer uses the Software and its in-product help and services.  This information helps Sage identify trends and usage patterns to improve the quality of the products and services Sage offers.  Additionally, Sage may collect information through PEP to enforce its rights under this Agreement (e.g., number of users for licensing, serial numbers, and registration numbers), and if a user updates user information via a request prompted by the Software, information provided will be stored in PEP and used to update Sage's customer records.

11.1.2.   <u>Other Uses</u>.  Even if Customer opts out of PEP, the Software monitors, records, and reports to Sage information about the installation and use of the Software, including, but not limited to, information about Customer's devices and the frequency, type, and manner of use to which the Software is put.  Customer acknowledges that Sage may collect, use, and disclose the information as described in the Sage Privacy Notice posted at <u><https://www.sage.com/en-us/legal/privacy-and-cookies/></u> (if you are contracting with Sage Software, Inc.) or <u><https://www.sage.com/en-ca/legal/privacy-and-cookies/></u> (if you are contracting with Sage Software Canada Ltd.), or such other URL as Sage may notify Customer of, and as may be described in the user interface associated with the applicable features.

11.2.   <u>Processing of EU Data</u>.  If the European Union's General Data Protection Regulation 2016/679 applies to Sage's processing or controlling of personal data, then the Data Processing Addendum posted at <u><https://www.sage.com/en-us/legal/eula/></u> (if you are contracting with Sage Software, Inc.), <u><https://www.sage.com/en-ca/legal/eula/></u> (if you are contracting with Sage Software Canada Ltd.), or such other URL as Sage may notify Customer of, shall apply.  Sage may amend such Data Processing Addendum from time to time and in its discretion.

**12.  Miscellaneous**

12.1.   <u>Independent Contractors</u>.  The parties are independent contractors and will so represent themselves in all regards.  Neither party is the agent of the other, and neither may make commitments on the other's behalf.

12.2.   <u>Notices</u>.  Notices required to be sent under this Agreement shall be sent (i) to Customer at the address set forth in its most recent Order Form, (ii) to Sage at Sage Software, 271 17th Street NW, Suite 1100, Atlanta, Georgia 30363, Attn: Legal Department, or (iii) to such other addresses as either party may provide in writing pursuant to this section.  Such notices will be deemed received at such addresses upon the earlier of (a) actual receipt or (b) delivery in person, by fax with written confirmation of receipt, or by certified mail return receipt requested.

12.3.   <u>Excused Performance; Force Majeure</u>.  No delay, failure, or default, other than a failure to pay fees when due, will constitute a breach of this Agreement to the extent caused by hurricanes, earthquakes, epidemics, other acts of God or of nature, strikes or other labor disputes, riots or other acts of civil disorder, acts of war, terrorism, acts of governments such as expropriation, condemnation, embargo, changes in laws, and shelter-in-place or similar orders, or other causes beyond the performing party's reasonable control.

12.4.   <u>Assignment</u>.  Sage may assign this Agreement to an Affiliate upon written notice to Customer.  Customer may not assign this Agreement without Sage's prior written consent.  If Sage (in its discretion) consents to the Assignment, Customer acknowledges that such consent may be conditioned upon the assignee (i) accepting this Agreement in writing; (ii) agreeing to reasonable transfer requirements required by Sage, (iii) if the assignment is part of a sale of less than all of the Customer's assets, ensuring that Customer does not retain a copy of the Software, or (iv) taking all or any combination of the foregoing actions.  Any other purported assignment of this Agreement shall be void.

12.5.   <u>Conflicts</u>.  If there is any conflict between the main body of this Agreement (sections 2 through 12 herein), any Order Form, or any Supplemental License Terms, then the main body of this Agreement will govern.

12.6.   <u>Entire Agreement</u>.  This Agreement represents the entire agreement between the parties and supersedes all prior or contemporaneous writings, negotiations, and discussions (including any purchase order, proposal, confirmation, advertising, representation, or other communication) with respect to its subject matter.

12.7.   <u>Severability</u>.  If any provision of this Agreement is found to be void, invalid, or unenforceable, it shall be severed from and shall not

Case ID: 211202070

affect the remainder of this Agreement, which shall remain valid and enforceable.  Any such severed provision shall be replaced with a similar provision which conforms to applicable law and embodies as closely as possible the original intent of the parties.

*(Template Last Updated - May 2020)*

Case ID: 211202070

# EXHIBIT B

Case ID: 211202070

sage 300cloud



SAGE 300CLOUD

## Manage Your Company with One Powerful Financial Tool

Your company is a big deal. Sales are good. You just hired a bunch of new talent and now you have your sights set for even brighter horizons. The challenge is you have lots of employees undertaking many big projects and they'll need to be aligned every step of the way.

**Designed for Growing Companies**

In order to continue your growth trajectory, you know you need more advanced tools. The home-grown software or carefully modified Excel worksheets of yesteryear aren't working for you anymore. You need a new tool to connect your disparate departments together. You want something flexible and powerful. You need something capable of scaling as you move to new markets, buy and sell companies, and consolidate your corporate structure. You need Sage 300cloud.

**Designed for Scale**

Sage 300cloud focuses on providing best in class financial tools. We are very good at helping companies manage multiple entities such as subsidiaries or franchises. For companies that operate internationally, we offer multi-currency capabilities and multi-lingual interfaces.

**Add What You Need**

As your business grows, your needs will change which means your BMS software will need to keep up. Sage 300cloud's uniquely positioned to help your company grow and add needed software confidently. We offer a catalogue of modules to help your business manage everything from finances, to project tracking, to managing sales and inventory. Here is a list of available modules available within the Sage 300cloud platform for you to add as needed.





*Sage 300cloud offers a secure, online portal with modern, intuitive UI so your team can work from just about anywhere.*

Case ID: 211202070

## Finance Tools

**General Ledger**

Set up and maintain your general ledger accounts. Enter or transfer transactions from various sources. Print a number of key accounting reports such as general ledger reports, including a chart of accounts, trial balance, posting journal, and transactions listing.

**General Ledger Consolidation**

For companies with multiple entities, our General Ledger Consolidation module helps provide the reporting needed to generate key financial reports for the corporate entity.

**Intercompany Transactions**

You can set up multiple companies, close books, and report results by company or consolidated company. Automate transactions that affect more than one of your companies. For example, a purchase order from one company will automatically become an Accounts Receivable entry in the other connected company.

**Accounts Receivable**

Understand your expected cash flow so you can plan for the future. Send invoices, track customer accounts and provide transaction details on demand.

**Accounts Payable**

Set up and maintain your vendor accounts, enter or import transactions from various sources, and print checks. Accounts Payable produces the reports you need to avoid late payment charges, secure vendor discounts, and match cash requirements to cash resources.

**Instant Bank Reconciliations**

Bank Reconciliation automates and simplifies the monthly reconciliation process. Detect unrecorded transactions and correct differences between your books and your bank account.

**AP Withholding & Reverse Charges (for Tax Calculations)**

Manage tax implications in your invoices like a breeze. AP Withholding helps you direct payable taxes to your tax authority directly while Reverse Charges enable you to calculate the taxes due on an invoice without taxes broken out.

## Project and Vendor Management

**Project and Job Costing**

Control project costs better. Track costs and revenue down to the finest details on every project. Manage contractors and subcontractors for their time, and related expenses. Track & monitor original project timelines and status. All costs, payables, and receivables can roll up to each area of the project.  Overhead, equipment, and materials are allocated to ensure the project is on time and on budget.  *This module integrates with Microsoft Project.*

**Multiple Contacts**

Manage accounts and correspondence like a breeze. This module enables you to attribute many stakeholders to an account or project. It also integrates with Microsoft Outlook so you can have the details you need in responding to a customer right there in your Outlook screen.



Manage Your Company with One Powerful Financial Tool

Case ID: 211202070

## Sales Processes

**Payment Processing**

Process credit and debit card transactions directly in Sage 300. We've partnered with Paya to provide a seamless checkout experience for our customers.

**Order Entry**

Manage a transaction throughout its sales lifecycle. Use the Order Entry module to enter orders or sales returns. Print invoices, quotes, order confirmations, picking slips, credit notes, debit notes, and shipping labels.

Order Entry is fully integrated with Inventory Control and Accounts Receivable, so you always know your inventory levels and the status of your customer accounts. It also integrates fully with Project and Job Costing, so you can sell merchandise that includes components such as labor, service, or contacting costs.

**Purchase Order**

Automate your purchase order procedures to make putting in an order easier than ever. Enter and process purchase requisitions, purchase orders, receipts, vendor invoices, returns, credit notes, and debit notes. You can also print forms for your requisitions, purchase orders, receipts, returns, and mailing labels.

Transactions in Purchase Orders update item quantities and costs in Inventory Control, and create batches of invoices, credit notes, and debit notes in Accounts Payable.

## Inventory Tools

**Inventory Control**

Inventory Control maintains detailed perpetual inventory records and produces reports to help you manage your stock effectively.

Regardless of the size and complexity of your business, you can adapt Inventory Control to meet your needs. Inventory Control easily handles the requirements of your existing inventory system and offers many flexible features you can use to manage your inventory effectively.

**Serialized Inventory & Lot Tracking**

Automatically generate serial numbers or lot numbers to items to help you keep better control of your stock.



Manage Your Company with One Powerful Financial Tool

Case ID: 211202070




*Sage 300cloud can also be accessed via a desktop application which is the UI most ISVs currently integrate with.*

## The Sage 300cloud Ecosystem

While Sage300cloud provides the foundation you need to support a growing business, we believe every business's needs are different. That's why we offer our customers the option to add additional software from Independent Software Vendors, also referred to as ISVs. Our strong support of ISVs started when the product was first introduced in the 90s and we continue to support this ecosystem to this day. Our open API means any modern ISV in the open market has the ability to integrate with Sage 300cloud.

As Sage has evolved, we've partnered with exceptional ISVs to create Sage-endorsed add-ons. These distinguished solutions commit to our extensive QA processes and agree to maintain their code base to support the latest Sage 300cloud releases.

To see which ISVs we've partnered with, [check out our Marketplace.](#)

### Predictable and Affordable SaaS Platform

Sage 300cloud prides ourselves in providing our customers with a great solution at a great value. Our subscription pricing enables businesses to predict their cost of usage accurately and enables our customers to plan for the future.

We offer cost-savings bundles which allows our customers to get the most out of Sage 300cloud without having to order every module a-la-carte. For customers who want to add additional Sage 300cloud modules or users, pricing is clear and implementation is easy.

### Support You Can Count On

Sage works with talented business partners and certified consultants across the US and Canada to help our customers get up and running. Your business partner will help you take care of what's needed to successfully deploy and maintain your Sage 300cloud platform. At Sage, we love our business partner community and we work closely with them to ensure our customers are well taken care of. We also offer additional resources online to take care of customers. See our [Sage University](#) courses (Sageu.csod.com) and [Knowledgebase](#) (support.na.sage.com) for more support information.

## Get Started with a 15-Day Trial

To get started with Sage 300cloud, we offer a 15-day demo. See how the solution works for yourself. Talk to a Sage certified business consultant today to get started with your 15-day free demo.



Manage Your Company with One Powerful Financial Tool

Case ID: 211202070

# EXHIBIT C

Case ID: 211202070

LicenseAgreement.txt

PrintBoss SOFTWARE LICENSE AGREEMENT

Do Not activate this Software until you have carefully read the following Software License Agreement.

This Agreement sets forth the terms and conditions for licensing of Software from Wellspring Software, Inc. (Wellspring) to your company including individuals who are your owners, employees or contractors (Customer).  Activating the Software, opening the Software packaging, installing and using the Software certifies that you have read and understand this Agreement and consent to be bound by its terms and conditions.  This Agreement applies to: a) trial or demonstration; b) single-user license; c) multi-user license; and d) special editions or promotional versions of the Software.  If you do not agree to all the terms of this Agreement, do not download, activate, open the package, or install the Software; promptly return the Software and accompanying items to the place of purchase within 30 days of purchase, with a copy of your invoice.  Activated Software CANNOT be returned.

Software is defined as the Wellspring computer program with which this Software license Agreement is included and any updates or maintenance releases thereto.

User License Grant: Wellspring grants to Customer a nonexclusive and nontransferable license to use the Software from Wellspring in object code form a) on either a single computer used by a single individual OR b) on a single file server owned and operated solely by and for the Customer and accessed by workstations used by individuals who are owners, employees or contractors of the Customer OR c) on a single hosted server for the Customer used by individuals who are owners, employees or contractors of the Customer.

PrintBoss Enterprise License Grant: In addition to the User License Grant privileges, if Customer purchased the Enterprise version of Software, then Wellspring grants to Customer a nonexclusive and nontransferable license to use Software on a computer connected through the internet to a Web-enabled version of accounting software from which Software receives information to print documents.

Customer may make one (1) archival copy of the Software solely for the purpose of reinstalling the Software, if needed, on the computer used by the same single individual or on the same single file server owned and operated solely by and for your Company, provided Customer affixes to such copy all copyright, confidentiality, and proprietary notices that appear on the original.

EXCEPT AS EXPRESSLY AUTHORIZED ABOVE, CUSTOMER SHALL NOT: COPY, IN WHOLE OR IN PART, SOFTWARE OR DOCUMENTATION; MODIFY THE SOFTWARE; REVERSE COMPILE OR REVERSE ASSEMBLE ALL OR ANY PORTION OF THE SOFTWARE; OR RENT, LEASE, DISTRIBUTE, SELL, OR CREATE DERIVATIVE WORKS OF THE SOFTWARE.

Customer agress that aspects of the licensed materials, including the specific design and structure of individual programs, constitute trade secrets and/or copyrighted material of Wellspring. Customer agrees not to disclose, provide, or otherwise make available such trade secrets or copyrighted material in any form to any third party without the prior written consent of Wellspring. Customer agrees to implement reasonable security measures to

Case ID: 211202070

LicenseAgreement.txt

protect such trade secrets and copyrighted material. Title to Software and documentation shall remain solely with
Wellspring.

Termination; Sunset Policy: This Agreement may be terminated by Wellspring immediately and without notice if customer fails to comply with any term or condition of this Agreement. Upon such termination, Customer must immediately destroy all complete and partial copies of the Software, including all backup copies.  This Software is subject to a Wellspring sunset or discontinuation policy ("Sunset Policy") and Wellspring reserves the right to discontinue all support for the Software, and/or for any features, services or content accessible through the Software in accordance with such Sunset Policy. Wellspring reserves the right to change the terms and conditions of this Agreement or the Sunset Policy.  For the latest version of this Agreement or the Sunset Policy, go to www.wellspringsoftware.com.  Your continued use of the Software indicates your agreement to any changes.

Return Policy: If you wish to return the software, Wellspring's entire liability and your exclusive remedy shall be either:  a) if you purchased the Software through a reseller, you must return the non-activated, unopened software package to the reseller within 30 days of purchase date or b) if you purchased the Software directly from Wellspring return the non-activated, unopened software package to Wellspring accompanied by a copy of the invoice within 30 days of the invoice date to Wellspring Software, Inc. 445 Sovereign Court Manchester, MO  63011.  Activated Software cannot be returned.

Replacement Policy: In the case of a defective disk, return the Software within sixty (60) days of purchase with a copy of the invoice for a replacement disk or instructions on how to download from our web site.

Limited Warranty:  Wellspring warrants that for a period of thirty (30) days from the date of shipment from Wellspring: (i) the media on which the Software is furnished will be free of defects in materials and workmanship under normal use; and (ii) the Software substantially conforms to its published specifications. Except for the foregoing, the Software is provided AS IS. This limited warranty extends only to Customer as the original licensee. Customer's exclusive remedy and the entire liability of Wellspring and its suppliers under this limited warranty will be, at Wellspring or its service center's option, repair, replacement, or refund of the Software if reported (or, upon request, returned) to the party supplying the Software to Customer. In no event does Wellspring warrant that the Software is error free or that Customer will be able to operate the Software without problems or interruptions.

This warranty does not apply if the software (a) has been altered, except by Wellspring, (b) has not been installed, operated, repaired, or maintained in accordance with instructions supplied by Wellspring, (c) has been subjected to abnormal physical or electrical stress, misuse, negligence, or accident, or (d) is used in ultra hazardous activities.

Disclaimer of Warranties.  EXCEPT AS PROVIDED ABOVE, THIS SOFTWARE AND ANY RELATED SERVICES OR CONTENT ACCESSIBLE THROUGH THE SOFTWARE ARE PROVIDED "AS-IS", AND TO THE MAXIMUM EXTENT PERMITTED BY APPLICABLE LAW, WELLSPRING SOFTWARE INC. DISCLAIMS ALL OTHER REPRESENTATIONS AND WARRANTIES, EXPRESS OR IMPLIED, REGARDING THIS SOFTWARE, DISKS, RELATED MATERIALS AND ANY SUCH SERVICES OR CONTENT, INCLUDING THEIR FITNESS FOR A PARTICULAR PURPOSE,

Case ID: 211202070

LicenseAgreement.txt
SECURITY, THEIR MERCHANTABILITY, OR THEIR NONINFRINGEMENT.

WELLSPRING DOES NOT WARRANT THAT THE SOFTWARE OR ANY RELATED SERVICES
OR CONTENT IS FREE FROM BUGS, VIRUSES, ERRORS, OR OTHER PROGRAM LIMITATIONS
NOR DOES Wellspring WARRANT ACCESS TO DATA ENTERED INTO ANY TRIAL OR BETA
VERSION OF THE SOFTWARE.

IN NO EVENT WILL WELLSPRING OR ITS SUPPLIERS BE LIABLE FOR ANY LOST REVENUE,
PROFIT, OR DATA, OR FOR SPECIAL, INDIRECT, CONSEQUENTIAL, INCIDENTAL, OR
PUNITIVE DAMAGES HOWEVER CAUSED AND REGARDLESS OF THE THEORY OF LIABILITY
ARISING OUT OF THE USE OF OR INABILITY TO USE THE SOFTWARE EVEN IF WELLSPRING
OR ITS SUPPLIERS HAVE BEEN ADVISED OF THE POSSIBILITY OF SUCH DAMAGES. THE
ENTIRE LIABILITY OF WELLSPRING OR ITS SUPPLIERS FOR ANY REASON SHALL BE
LIMITED TO THE AMOUNT PAID BY THE CUSTOMER FOR THE SOFTWARE. The foregoing
limitations shall apply even if the above-stated warranty fails of its essential purpose. SOME
STATES DO NOT ALLOW LIMITATION OR EXCLUSION OF LIABILITY FOR CONSEQUENTIAL
OR INCIDENTAL DAMAGES.

The above warranty DOES NOT apply to any beta software, any software made available
for testing or demonstration purposes, any temporary software modules or any software
for which Wellspring does not receive a license fee. All such software products are
provided AS IS without any warranty whatsoever.

This License is effective until terminated. Customer may terminate this License at any time by
destroying all copies of Software including any documentation. This License will terminate
immediately without notice from Wellspring if Customer fails to comply with any provision of
this License. Upon termination, Customer must destroy all copies of Software.

Software, including technical data, is subject to U.S. export control laws, including the U.S.
Export Administration Act and its associated regulations, and may be subject to export or
import regulations in other countries. Customer agrees to comply strictly with all such
regulations and acknowledges that it has the responsibility to obtain licenses to export, re-
export, or import Software.

This License shall be governed by and construed in accordance with the laws of the State
of Missouri, United States of America, as if performed wholly within the state and without
giving effect to the principles of conflict of law. If any portion hereof is found to be void or
unenforceable, the remaining provisions of this License shall remain in full force and effect.
This License constitutes the entire License between the parties with respect to the use of
the Software.

Case ID: 211202070

# EXHIBIT D

Case ID: 211202070

# Add **PrintBoss** to your accounting software
## To create new features and benefits!

- One check stock for all checks
- Seamless integration with accounting software
- Software controlled printing/archiving of copies

- Print security verified signatures
- Automatically email any document
- Automatically create a Positive Pay File



**To Final Form**

**From Blank Form**

# **PrintBoss**  -  Print with <u>Quality</u> and <u>Security</u>!

## Print more than checks:
Invoices, Statements, Purchase Orders on blank paper

## Save Money
Reduce forms costs by 80% or more!

Case ID: 211202070

# Check printing made easy and secure...

## Print Checks:

| Feature | Benefit |
|---|---|
| Print checks on blank check stock | Only purchase one check stock to print checks for multiple companies or multiple bank accounts. |
| Seamless integration with accounting software | No additional keystrokes are required to print a document.  All documents are printed using the standard keystrokes from within the host accounting package. |
| Print security verified signatures | Signatures can be printed on any check.  Signature printing can be conditional based on the amount of the check or the bank account used.  Either a password or a diskette makes the signature secure. |
| Check copies can be printed in any order | When printing check copies, they can be printed in an order that is consistent with how they will be used or filed. (The Customer File copy can print in Customer order, the Accounting File copy can print in check number order or invoice number order, etc.) |
| A compressed copy of check and advice at the top of the check form | When checks are printed, the top 4-inch section of the page can be printed with a compressed copy of both the check and the advice. This compressed copy can be detached (it is perforated) and kept as a copy. This is in addition to full page copies that are also available. |

## Print Other Accounting Forms:

| Feature | Benefit |
|---|---|
| Never order accounting forms again | Invoices, Purchase Orders, etc. will all print on blank paper including additional copies of a form.  (e.g. Customer Copy, Accounting Copy, etc)  This feature virtually eliminates the cost of multiple part forms. |
| Wellspring Software blue fade invoice paper | Invoices and other accounting documents can be printed on this stock to create a more professional looking document. |
| Customize forms | The end user has the ability to create or modify a PrintBoss form to create unique accounting documents for different companies. |
| Email Documents | Send original documents or document copies via email. |

## Check Stock – Security Features

✓ **Toner Grip Paper**    All Wellspring Software check stock is Toner Grip paper because writing a check should never expose your money to easy fraud. Toner Grip paper chemically bonds the last toner to the paper so that any modification of characters printed on the paper requires the actual paper fibers to be ripped away. This feature combined with the background patterns printed on the check stock make any attempt to alter information printed on a check much more noticeable.

✓ **VOID Pantograph**    If the check is copied the word VOID appears many times on the face of the copy.

✓ **Rainbow Background**    A special printing process is required to produce the two color background. This background is very difficult to copy using a color copy machine.

✓ **Micro Printing**    The line creating the border of the check is actually printed words: "Wellspring Software". This printing is too small to be copied on a photo copy machine and it is referenced on the front of the check with a security feature warning message.

✓ **True Watermark**    Each sheet of our high-security check-stock has a crosshatched watermark, which cannot be copies by a photocopy machine. Warning clauses are printed on the front and the back of the check that reference this feature.

✓ **Florescent Fibers**    The check paper has florescent and visible fibers that are embedded into the paper.  Holding the paper under an ultraviolet light will cause the fibers to glow.  Warning clauses for this feature are printed on the face of the check.

**www.wellspringsoftware.com**

Case ID: 211202070