## IN THE UNITED STATES DISTRICT COURT FOR THE
## EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| DELAWARE RIVER WATERFRONT CORPORATION, | : | |
| | : | |
| Plaintiff, | : | CIVIL ACTION |
| | : | |
| v. | : | |
| | : | NO.  2:22-cv-01905-TJS |
| SAGE SOFTWARE, INC. and WELLSPRING SOFTWARE, INC. d/b/a PRINTBOSS, | : | |
| | : | |
| Defendants. | : | JURY TRIAL DEMANDED |

## FIRST AMENDED COMPLAINT

Plaintiff Delaware River Waterfront Corporation ("DRWC"), for its First Amended Complaint against Defendants Sage Software, Inc. ("Sage") and Wellspring Software, Inc. d/b/a PrintBoss ("Wellspring") (collectively, "Defendants"), alleges as follows:

## PRELIMINARY STATEMENT

1.      This action seeks recovery of funds lost due to Defendants' negligence and misrepresentations regarding the security and accuracy provided by their software.

2.      Between January 2013 and October 2019, Defendants' accounting software permitted DRWC's former Accounting Administrator, Angela Sabatine ("Sabatine"), to cash at least 318 checks that were drawn on a DRWC account and made payable to Sabatine. On information and belief, Sabatine was able to carry out her scheme using Defendants' software, which allowed her to alter checks after being created within the software and to conceal the transactions from DRWC using valid vendor information.

3.      As a direct consequence of Defendants' negligence and misrepresentations regarding the capabilities of their software, Sabatine was able to embezzle over $2.4 million in funds from DRWC.

4.      In February 2022, Sabatine pleaded guilty to wire fraud, bank fraud, and identity theft charges in connection with her embezzlement from DRWC.  Sabatine has not yet been sentenced.

5.      Defendants' negligence and misrepresentations have caused DRWC to suffer direct pecuniary losses and other consequential damages due to Sabatine's unchecked ability to issue checks improperly and receive funds to which she was not entitled.

6.      DRWC seeks compensatory damages against Defendants for their failure to adhere to the proper standard of care in designing and marketing their products and misrepresenting the capabilities of their products, which has resulted in substantial losses for DRWC over a period of years.

**PARTIES AND RELATED INDIVIDUALS**

7.      Plaintiff DRWC is a Pennsylvania non-profit development corporation, and has its principal place of business at 121 N. Columbus Boulevard, Philadelphia, PA 19106. The fundamental purpose of DRWC is to design, develop, and manage the central Delaware River Waterfront in Philadelphia between Oregon and Allegheny Avenues. DRWC's mission is to transform the central Delaware River Waterfront into a vibrant destination for recreational, cultural, and commercial activities for Philadelphia residents and visitors.

8.      Defendant Sage is a Virginia corporation with its principal place of business at 271 17th Street NW, Suite 1100, Atlanta, GA 30363.

9.     Defendant Wellspring is a Missouri corporation with its principal place of business at 445 Sovereign Ct., Manchester, MO 63011.

10.     Sabatine was the Accounting Administrator for DRWC from at least 1999 through November 1, 2019. Sabatine's responsibilities at DRWC included issuance of checks to vendors for accounts payable.

## JURISDICTION AND VENUE

11.     This Court has jurisdiction over this action pursuant to 42 Pa. C.S. § 931.

12.     Pursuant to Pennsylvania Rules of Civil Procedure 1006(b), 1006(c)(1), 2156(a), and 2179(a)(2) & (3), venue is proper because Defendants regularly conduct business in Philadelphia County, Pennsylvania, and the matters giving rise to this First Amended Complaint occurred in Philadelphia County, Pennsylvania.

## SAGE AND PRINTBOSS SOFTWARE

13.     Sage owns and markets a software program called "Sage 300cloud" that allows users of the software to, among other things, set up and maintain a general ledger within the program, generate financial reports, set up and maintain vendor accounts, enter or import transactions from various sources, print checks, and detect unrecorded transactions with bank reconciliations.

14.     Wellspring owns and markets a product called "PrintBoss" that integrates with Sage 300cloud products to receive vendor information from Sage 300cloud, pair that information with the correct bank information for a vendor, and allow purchasers to print checks payable to that vendor.

15.     Wellspring's website states: "User permissions, encrypted bank information, and electronic signatures make your payments secure. Feel safe knowing PrintBoss is a trusted Sage

Endorsed Partner." *See* https://www.printboss.com/printboss-software/printboss-for-sage (last visited April 14, 2022).

16.     In or around 1996, DRWC utilized a program called ACCPAC, a predecessor software to Sage 300cloud that had a substantially similar purpose and functionality as Sage 300cloud.

17.     Upon information and belief, Sage acquired the ACCPAC program in 2004 and DRWC thereafter contracted with Sage to utilize ACCPAC and ACCPAC's successor programs, up to and including Sage 300cloud. Sage 300cloud and its predecessor software versions licensed from Sage by DRWC will be referred to collectively as "the Sage Software."

18.     Through the date of this filing, DRWC has annually renewed its license with Sage for the Sage Software.

19.     From time to time, the license agreement distributed by Sage has been updated.  A copy of the license agreement that currently appears when users of Sage 300cloud open the program, the Sage End User License Agreement ("Sage License Agreement), which is undated, is attached hereto at Ex. A.

20.     After a diligent search of DRWC's records, DRWC does not believe that it has possession of any other agreements from Sage regarding the Sage Software.

21.     In the marketing materials for Sage 300cloud, which were distributed to DRWC when it most recently renewed its license, Sage states that Sage 300cloud will "[d]etect unrecorded transactions and correct differences between your books and your bank account." *See, e.g.,* Sage 300cloud: Manage Your Company with One Powerful Financial Tool at p. 2, Ex. B.

22.     Upon information and belief, the representations made in the Sage marketing materials regarding Sage 300cloud are substantially similar to the representations made by Sage to DRWC regarding the Sage Software since at least 2012.

23.     Nowhere in the Sage marketing materials or Sage License Agreement does Sage state that the Sage Software allows users to modify invoices and purchase order information to conceal unauthorized transactions.

24.     Upon information and belief, Sage has never communicated to DRWC that the Sage Software allows users to modify invoices and purchase order information to conceal unauthorized transactions.

25.     The Sage Software, in conjunction with PrintBoss, also allows users to create checks.

26.     Nowhere in the Sage marketing materials or Sage License Agreement does Sage state that the Sage Software allows users to export checks to other software programs, like Microsoft Word, that allow the checks to be altered.

27.     The Sage License Agreement expressly disclaims any express or implied warranties, including any warranties of merchantability.  *See* Ex. A § 5.4.

28.     The disclaimers of warranties in the Sage License Agreement are not consistent with the representations and omissions made by Sage in marketing the Sage Software, including its representation that the software would "[d]etect unrecorded transactions and correct differences between your books and your bank account," and its omission of the fact that checks created with the software could be exported to Microsoft Word and altered.

29.     In or around 1999, DRWC contracted with Wellspring to license PrintBoss software compatible with the Sage Software.

5

30.     Through the date of this filing, DRWC has annually renewed its license with Wellspring for PrintBoss.

31.     From time to time, the license agreement distributed by Wellspring for PrintBoss has been updated.  A copy of the license agreement that currently appears when users of PrintBoss open the program, the PrintBoss Software License Agreement ("PrintBoss License Agreement"), which is undated, is attached hereto at Ex. C.

32.     After a diligent search of DRWC's records, DRWC does not believe that it has possession of any other agreements from Wellspring regarding PrintBoss.

33.     In Wellspring's marketing materials for PrintBoss, which were distributed to DRWC when DRWC most recently renewed its license, Wellspring repeatedly markets the security that PrintBoss software offers.  It states:

    a.     that PrintBoss can be used to "print security verified signatures";

    b.     "Printboss – Print with Quality and Security!" in purple font larger than the surrounding text (emphasis in original);

    c.     "Check printing made easy and secure . . ." in orange font larger than the surrounding text;

    d.     "Either a password or a diskette makes the signature secure"; and

    e.     "All Wellspring Software check stock is Toner Grip paper because writing a check should never expose your money to easy fraud."  *See* Add PrintBoss to your accounting software, Ex. D.

34.     Upon information and belief, the representations made in the current Wellspring marketing materials regarding PrintBoss are substantially similar to the representations made by Wellspring to DRWC regarding PrintBoss since at least 2012.

6

35.     Nowhere in the marketing materials or PrintBoss License Agreement does Wellspring state that PrintBoss allows users to export checks into software like Microsoft Word that allows the checks to be altered.

36.     Upon information and belief, Wellspring has never stated that PrintBoss allows users to export checks into software like Microsoft Word that allows the checks to be altered.

37.     The PrintBoss License Agreement includes a "Disclaimer of Warranties" that disclaims all express or implied warranties, including implied warranties of merchantability and fitness for a particular purpose.  See Ex. D.

38.     The warranty disclaimer in the PrintBoss License Agreement is not consistent with the representations and omissions made by Wellspring, including its representation that it securely prints checks and its omission of the fact that it allows users to export checks to software programs like Microsoft Word that allow checks to be altered.

## SABATINE'S EMBEZZLEMENT

39.     At all relevant times, DRWC used the Sage Software as its accounts payable software system, along with PrintBoss to print checks. To issue a check payable to a DRWC vendor, an authorized operator would enter a purchase order into the Sage Software ("the Purchase Order"). Typically, that Purchase Order would correspond to an invoice that was provided by the vendor to DRWC, whether in paper or electronic form ("the Vendor Invoice").

40.     Prior to September 2017, only Sabatine and two other DRWC employees had access to the Sage Software at DRWC.  Anusha Gopalan ("Gopalan"), the DRWC Finance Manager who eventually assumed many of Sabatine's duties after her termination, gained the Sage Software access as of September 2017. In 2018, additional staff members were given very

limited electronic access to a Sage module to input purchase order requests to be routed for approval.

41.     At all relevant times, Sabatine had the ability to remotely connect to DRWC's systems through an application called "logmein" and had VPN access to the Sage Software.

42.     Effective November 1, 2019, Sabatine's employment with DRWC was terminated for poor work performance pursuant to a Separation Agreement and General Release.

43.     In or about January 2020, Gopalan discovered irregularities in an accounts payable account held at TD Bank that Sabatine had previously administered ("the Account").

44.     Gopalan elevated her concerns to DRWC's Vice President of Finance and Human Resources, Rinku Modi ("Modi"), and DRWC's President, Joe Forkin ("Forkin"), who launched an internal investigation.

45.     The authorized signers for the Account were Forkin, Modi, and two other DRWC employees.  Sabatine was never a signer on the Account.

46.     Based on DRWC's Purchase Order and Check Approval/Signing Policy, checks from the Account for $1,001 and over required two signatures.

47.     A review of bank statements for the Account shows that more than $2.4 million of unauthorized checks were made payable to Sabatine between 2013 and 2019 ("the Checks").

48.     A review of the Checks and the Sage Software system reveals the following:

        a.     The Sage Software and/or PrintBoss were used to issue at least 318 unauthorized checks payable to Sabatine, totaling more than $2.4 million, between January 2013 and October 2019.

     b.     Each of those approximately 318 checks was booked into DRWC's system as having been paid to a legitimate DRWC vendor. As a result, the Checks appear in the Accounts Payable Vendor Transaction reports pertaining to various legitimate vendors.

     c.     At least 43 legitimate vendor accounts ("the Vendors") were utilized in the scheme.

     d.     Each of the Vendors provided services for DRWC on an irregular basis, such that irregularities in payment to the Vendors would be difficult to spot.

     e.     For all of the Checks, there is a corresponding Purchase Order.

     f.     For at least 50 of the Checks, there is a Purchase Order and an altered Vendor Invoice with metadata tracing back to Sabatine's computer, specifically, to "Desktop Computer – Asabatine\Documents" ("the Altered Vendor Invoices").

     g.     On the Altered Vendor Invoices, the invoice number, invoice date, transaction text, line amount, and totals appear in different font than other text on the same invoices and other text on legitimate invoices to the same vendor. Other information on the Altered Vendor Invoices, including sales order number and a portion of the project name, appears to have been whited out.

     h.     The Checks were deposited into Sabatine's personal bank account at PNC with account number ending in -6623, which is the same account that Sabatine used to receive her direct deposit of wages from DRWC while she was employed there.

     i.     The Checks are typically in amounts just shy of $10,000 and are typically in uneven amounts.

49.     Two of the authorized signers on the Account, Forkin and Modi, have reviewed the Checks and determined that their signatures are forged on the Checks.

50.     A review of the signature cards for the Account confirms that the signatures are forgeries.

51.     One of the Vendors, Waste Management, confirmed that the Checks did not correspond to work they performed for DRWC and that they neither requested nor authorized the issuance of the Checks.

52.     In February 2022, Sabatine pleaded guilty to wire fraud, bank fraud, and identify theft charges in connection with her embezzlement from DRWC.  Sabatine has not yet been sentenced.

**SAGE AND PRINTBOSS PERMITTED THE SCHEME TO OCCUR**

53.     After Sabatine's embezzlement was discovered, Charles Green from Kastech Consulting, Inc., DRWC's technical consultant for Sage, confirmed that there was a loophole within that would allow a Sage Software user to convert a Sage-issued check to Word format, change the payee, and print the check with the altered payee, while still preserving the original payee within DRWC's accounting and vendor management records. Green has since identified and detailed additional methods by which Sabatine could have embezzled using the Sage Software.

54.     The Sage Software allowed Sabatine to input legitimate vendor and invoice information in DRWC's accounting software to evade detection by DRWC, and later export the generated checks to Microsoft Word for altering to suit her scheme.

55.     The Sage Software also allowed Sabatine to print multiple checks with the same check number.

56.     The Sage Software and Printboss also allowed Sabatine to export checks to another software program, namely, Microsoft Word, in which she could alter the checks in any

way, like changing the payee from a legitimate vendor to herself.  Because Sabatine made these edits post-export to Microsoft Word, the edits did not tie back into DRWC's accounting software and vendor internal controls, permitting Sabatine to evade detection.

57.     Rather than detecting unrecorded transactions and correcting differences between DRWC's books and bank account as warranted, the Sage Software was actually used by Sabatine to create and hide unrecorded transactions.

58.     Sage's representation that the Sage Software would "detect unrecorded transactions and correct differences between your books and your bank account" lulled DRWC into believing that the transactions recorded in Sage were accurate for nearly eight years when in fact Sabatine had been embezzling millions of dollars using a Sage and PrintBoss loophole.

59.     Rather than securely printing checks and preventing fraud, as Wellspring warranted, PrintBoss allowed Sabatine to create unauthorized checks made out to her personal account.

60.     Wellspring's warranty that PrintBoss would secure the check printing process lulled DWRC into believing that the transactions recorded in the Sage Software were accurate for nearly eight years when in fact Sabatine had been embezzling millions of dollars.

**COUNT I – NEGLIGENCE**
**(Plaintiff DRWC v. Defendant Sage)**

61.     DRWC incorporates by reference all prior Paragraphs of this First Amended Complaint as if fully set forth here.

62.     Sage created and marketed the Sage Software in order to allow businesses to manage and track their financial transactions accurately.

63.     Sage had a duty to DRWC to design and market the Sage Software with the care that an ordinarily prudent person would take under similar circumstances.

11

64.     Sage breached its duty to DRWC in several ways, including but not limited to the following:

a.      Designing the Sage Software in a manner that allows users to create and print unauthorized checks;

b.      Designing the Sage Software in a manner that, when used in conjunction with PrintBoss, allows users to create and print unauthorized checks,

c.      Designing and creating the Sage Software in a manner that failed to notify DRWC, as the licensor of the product, that the product was being used to create and print unauthorized checks;

d.      Designing the Sage Software in a manner that allows users to create checks for non-existent or materially altered invoices; and

e.      Marketing the Sage Software in a manner that assured DRWC that the products would detect unauthorized transactions on the account, when in fact the software itself allowed users to create and conceal unauthorized transactions.

65.     Sage's breaches caused Sabatine to be able to issue unauthorized checks payable to herself.

66.     Sage's breaches caused Sabatine's unauthorized transactions to be concealed from DRWC.

67.     Sage's breaches caused DRWC to be unaware that Sabatine could use the Sage Software to issue checks to herself.

68.     As a result of Sage's breaches, DRWC has sustained damages in excess of $50,000.

WHEREFORE, Plaintiff demands judgment in favor of DRWC against Defendant Sage in an amount in excess of $50,000 and other such relief as the court may deem just and proper.

## COUNT II – NEGLIGENCE
### (Plaintiff DRWC v. Defendant Wellspring)

69.     DRWC incorporates by reference all prior Paragraphs of this First Amended Complaint as if fully set forth here.

70.     Defendant Wellspring created and marketed PrintBoss software to allow customers to securely print checks.

71.     Wellspring had a duty to DRWC to design and market PrintBoss with the care that an ordinarily prudent person would take under similar circumstances.

72.     Wellspring breached its duty to DRWC in several ways, including but not limited to the following:

a.     Designing PrintBoss in a manner that allows users to create and print unauthorized checks;

b.     Designing PrintBoss in such a manner that, when used in conjunction with the Sage Software, allows users to create and print unauthorized checks;

c.     Designing and creating PrintBoss in a manner that fails to notify DRWC, as the licensor of the product, when the product is being used to create and print unauthorized checks; and

d.     Marketing PrintBoss in a manner that assures DRWC that the products would securely print checks and prevent fraud, when in fact the software itself allowed Sabatine to create unauthorized checks made out to her personal account.

73.     Wellspring's breaches caused Sabatine to be able to issue unauthorized checks payable to herself.

13

74.     Wellspring's breaches caused Sabatine's unauthorized transactions to be concealed from DRWC.

75.     Wellspring's breaches caused DRWC to be unaware that Sabatine could use PrintBoss to issue checks to herself.

76.     As a result of Wellspring's breaches, DRWC has sustained damages in excess of $50,000.

WHEREFORE, Plaintiff demands judgment in favor of DRWC against Defendant Wellspring in an amount in excess of $50,000 and other such relief as the court may deem just and proper.

## COUNT III – FRAUDULENT MISREPRESENTATION
### (Plaintiff DRWC v. Defendant Sage)

77.     DRWC incorporates by reference all prior Paragraphs of this First Amended Complaint as if fully set forth herein.

78.     As discussed above, Sage represented in its marketing materials that the Sage Software could "[d]etect unrecorded transactions and correct differences between your books and your bank account."

79.     Sage omitted to state that the Sage Software could be used to create unauthorized transactions.

80.     While Sage stated that users could use the Sage Software to print checks, Sage omitted to state that users could export checks from the Sage Software into other software that would allow the checks to be altered, using PrintBoss or otherwise.

81.     Sage's representations that the Sage Software could be used to detect unrecorded transactions was material to the tranasaction; it is essential to DRWC that it keeps accurate books and records and prevents fraud within its own organization.

14

82.     Sage's omission to state that users could export checks from the Sage Software into other software that would allow the checks to be altered was material to the transaction; had DRWC known that such a feature existed, it either would not have purchased or renewed the software license or would have added additional internal controls to safeguard against the export feature.

83.     The Sage Software, in fact, allowed checks to be exported to other software that would allow checks to be altered, thereby allowing users to issue unauthorized checks.

84.     Sage omitted to state that the Sage Software could be used to export checks to other software that would allow checks to be altered when it knew or should have known, or had reckless disregard for whether, or was grossly negligent regarding the fact that the Sage Software would allow such an action.

85.     Sage represented that the Sage Software would detect unrecorded transactions when it knew or should have known, or had reckless disregard for whether, or was grossly negligent regarding the fact that the software in fact allows users to create unauthorized transactions by altering invoice and purchase order information to match the fraudulent checks, thereby concealing the transactions within the program.

86.     Sage's statements and omissions cited above regarding the Sage Software were intentionally made to mislead consumers into purchasing and renewing the software.

87.     DRWC relied on Sage's statements and omissions cited above in purchasing and renewing the Sage Software.

88.     As a  result of its reliance on Sage's statements, DRWC purchased and renewed the Sage Software with the understanding that it would not allow the creation and concealment of unauthorized transactions, and would not allow users to export checks into other software

15

programs for alteration, when in fact it allowed Sabatine to enact and conceal her check-cashing scheme.

WHEREFORE, Plaintiff demands judgment in favor of DRWC against Defendant Sage in an amount in excess of $50,000 and other such relief as the court may deem just and proper.

## COUNT IV – FRAUDULENT MISREPRESENTATION
### (Plaintiff DRWC v. Defendant Wellspring)

89.     DRWC incorporates by reference all prior Paragraphs of this First Amended Complaint as if fully set forth herein.

90.     As discussed above, Wellspring made repeated representations in its marketing materials regarding the security offered by its PrintBoss software.

91.     Wellspring omitted to state that PrintBoss would allow checks to be exported to other programs in which the checks could be altered.

92.     Wellspring's representations of enhanced security were material to the transaction.  As discussed above, Wellspring specifically marketed enhanced security as one of PrintBoss's primary functions.

93.     PrintBoss in fact allowed checks to be exported to other software that would allow checks to be altered, thereby eliminating and contravening any purported security measures within the PrintBoss program.

94.     Wellspring made its statements regarding the security of its software with knowledge that the software in fact allowed checks to be exported to other software that would allow checks to be altered, or with reckless disregard or gross negligence as to whether the software allowed checks to be exported to other programs in which they could be altered.

95.     Wellspring's statements regarding the security of PrintBoss software were made intentionally to mislead consumers into purchasing the software.

16

96.     DRWC relied on Wellspring's statements regarding the security offered by PrintBoss.

97.     As a result of its reliance on Wellspring's statements, DRWC purchased PrintBoss with the understanding that it would be secure, when in fact it allowed Sabatine to enact her check-cashing scheme.

WHEREFORE, Plaintiff demands judgment in favor of DRWC against Defendant Wellspring in an amount in excess of $50,000 and other such relief as the court may deem just and proper.

## COUNT V – NEGLIGENT MISREPRESENTATION
### (Plaintiff DRWC v. Defendant Sage)

98.     DRWC incorporates by reference all prior Paragraphs of this First Amended Complaint as if fully set forth herein.

99.     As discussed above, Sage represented in its marketing materials that the Sage Software could "[d]etect unrecorded transactions and correct differences between your books and your bank account."

100.    Sage omitted to state that the Sage Software could be used to create unauthorized transactions.

101.    While Sage stated that users could use the Sage Software to print checks, Sage omitted to state that users could export checks from the Sage Software into other software that would allow the checks to be altered, using PrintBoss or otherwise.

102.    Sage's representations that it could be used to detect unrecorded transactions was material to the tranasaction; it is essential to DRWC that it keeps accurate books and records and prevents fraud within its own organization.

17

103.   Sage's omission to state that users could export checks from the Sage Software into other software that would allow the checks to be altered was material to the transaction; had DRWC known that such a feature existed, it either would not have purchased or renewed the software or would have added additional internal controls to safeguard against the export feature.

104.   The Sage Software, in fact, allowed checks to be exported to other software that would allow checks to be altered, thereby allowing users to issue unauthorized checks.

105.   Sage omitted to state that the Sage Software could be used to export checks to other software that would allow checks to be altered when it knew that the Sage Software would allow such an action.

106.   Sage represented that the Sage Software would detect unrecorded transactions when it knew or should have known that the Sage Software in fact allows users to create unauthorized transactions by altering invoice and purchase order information to match the fraudulent checks, thereby concealing the transactions within the program.

107.   Sage's statements and omissions cited above regarding the Sage Software were made intentionally to mislead consumers into purchasing and renewing the software.

108.   DRWC relied on Sage's statements and omissions cited above in purchasing and renewing the Sage Software.

109.   As a  result of its reliance on Sage's statements, DRWC purchased the Sage Software with the understanding that it would not allow the creation and concealment of unauthorized transactions, and would not allow users to export checks into other software programs for alteration, when in fact it allowed Sabatine to enact and conceal her check-cashing scheme.

WHEREFORE, Plaintiff demands judgment in favor of DRWC against Defendant Sage in an amount in excess of $50,000 and other such relief as the court may deem just and proper.

### COUNT VI – NEGLIGENT MISREPRESENTATION
**(Plaintiff DRWC v. Defendant Wellspring)**

110.     DRWC incorporates by reference all prior Paragraphs of this First Amended Complaint as if fully set forth herein.

111.     As discussed above, Wellspring made repeated representations in its marketing materials regarding the security offered by its PrintBoss software.

112.     Wellspring omitted to state that PrintBoss would allow checks to be exported to other programs in which the checks could be altered.

113.     Wellspring's representations of enhanced security were material to the transaction.  As discussed above, Wellspring specifically marketed enhanced security as one of PrintBoss's primary functions.

114.     PrintBoss in fact allowed checks to be exported to other software that would allow checks to be altered, thereby eliminating and contravening any purported security measures within the PrintBoss program.

115.     PrintBoss, in fact, allowed signatures to be forged on the Checks by contravening internal controls around vendor management and dual signature check requirements.

116.     Wellspring made its statements regarding the security of its software when it knew or should have known that the software in fact allowed checks to be exported to other software that would allow checks to be altered.

117.     Wellspring made its statements regarding the security of its software when it knew or should have known that the software in fact allowed signatures on checks to be forged

19

in ways that would not be caught be existing internal controls within accounting and vendor software.

118.    Wellspring's statements regarding the security of PrintBoss software were made intentionally to mislead consumers into purchasing the software.

119.    DRWC relied on Wellspring's statements regarding the security offered by PrintBoss.

120.    As a  result of its reliance on Wellspring's statements, DRWC purchased PrintBoss with the understanding that it would be secure, when in fact it allowed Sabatine to enact her check-cashing scheme.

WHEREFORE, Plaintiff demands judgment in favor of DRWC against Defendant Wellspring in an amount in excess of $50,000 and other such relief as the court may deem just and proper.

## JURY DEMAND

Plaintiff demands a trial by jury on all matters triable by jury.

Dated: June 2, 2022

**SAUL EWING ARNSTEIN & LEHR LLP**
By:   */s/ Jennifer L. Beidel*

Jennifer L. Beidel, Esq. (Pa. Bar ID # 204450)
Amy S. Kline, Esq. (Pa. Bar ID # 84690)
Centre Square West, 38th Floor
1500 Market Street
Philadelphia, Pennsylvania 19102-2186
Telephone: (215) 972-7850
Fax: (215) 972-2291
Jennifer.Beidel@saul.com
Amy.Kline@saul.com

*Attorneys for Plaintiff Delaware River Waterfront Corporation*

20

**IN THE UNITED STATES DISTRICT COURT FOR THE
EASTERN DISTRICT OF PENNSYLVANIA**

|  |  |  |
|---|---|---|
| DELAWARE RIVER WATERFRONT CORPORATION, | : : : | |
| Plaintiff, | : : | CIVIL ACTION |
| v. | : : : | NO.   2:22-cv-01905-TJS |
| SAGE SOFTWARE, INC. and WELLSPRING SOFTWARE, INC. d/b/a PRINTBOSS, | : : : : | |
| Defendants. | : : | JURY TRIAL DEMANDED |

## <u>CERTIFICATE OF SERVICE</u>

I, Jennifer L. Beidel, Esquire, hereby certify that a true and correct copy of Plaintiff Delaware River Waterfront Corporation's First Amended Complaint, has been served upon all counsel of record via email as follows:

Mary Kay Brown, Esq.
Jami B. Nimeroff, Esq.
Brown McGarry Nimeroff LLC
Two Penn Center, Suite 610
1500 JFK Blvd.
Philadelphia, PA 19102
mkbrown@bmnlawyers.com
jnimeroff@bmnlawyers.com

*Attorneys for The Sage Group plc and Defendant Sage Software, Inc.*

Robyn D. Kazatsky, Esq.
Lock Gordon Law Group, LLC
18 Campus Blvd., Suite 100
Newtown Square, PA 19073
rkazatsky@lockgordon.com

*Attorney for Defendant Wellspring Software, Inc. d/b/a PrintBoss*

Dated:  June 2, 2022

**SAUL EWING ARNSTEIN & LEHR LLP**

By: */s/ Jennifer L. Beidel*
Jennifer L. Beidel, Esq. (Pa. Bar ID # 204450)
Amy S. Kline, Esq. (Pa. Bar ID # 84690)
Centre Square West, 38th Floor
1500 Market Street
Philadelphia, Pennsylvania 19102-2186
Telephone: (215) 972-7850
Fax: (215) 972-2291
Jennifer.Beidel@saul.com
Amy.Kline@saul.com

*Attorneys for Plaintiff Delaware River Waterfront
Corporation*