**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| **DELAWARE RIVER** | : | **CIVIL ACTION** |
| **WATERFRONT CORPORATION** | : | |
| | : | |
| **v.** | : | |
| | : | |
| **WELLSPRING SOFTWARE, INC. and** | : | |
| **SAGE SOFTWARE, INC.** | : | **NO. 22-1905** |

<u>**MEMORANDUM OPINION**</u>

Savage, J.                                                                December 22, 2022

Plaintiff Delaware River Waterfront Corporation ("DRWC") licensed accounting software from defendants Sage Software, Inc. ("Sage") and Wellspring Software, Inc. ("Wellspring").  It used Sage 300cloud as its accounts payable software system and Wellspring's PrintBoss to print checks.

DRWC brought this action to recover $2.4 million dollars that a former employee embezzled using the software.  Invoking diversity jurisdiction,[1] it asserts state law tort claims for fraudulent misrepresentation, negligent misrepresentation, and negligence.  It contends that Wellspring misrepresented PrintBoss's security in its marketing materials and on its website, and that Sage's software program had a security loophole that enabled the embezzlement scheme.

Each defendant has filed a motion to dismiss under Federal Rule of Civil Procedure 12(b)(6).  Wellspring contends that the parol evidence rule precludes DRWC from relying

---

[1] For diversity jurisdiction to exist, no plaintiff can be a citizen of the same state as any defendant. 28 U.S.C. § 1332(a); *GBForefront, L.P. v. Forefront Mgmt. Grp., LLC*, 888 F.3d 29, 34 (3d Cir. 2018).  Here, the parties are citizens of different states.  DRWC is a Pennsylvania non-profit corporation with its principal place of business in Philadelphia, Pennsylvania.  Verified Compl. ¶ 7, ECF No. 1-6 (attached as Ex. 3 to Notice of Removal, ECF No. 1) ["Compl."]; Notice of Removal ¶ 7.  Sage is a Virginia corporation with its principal place of business in Atlanta, Georgia.  Compl. ¶ 8; Notice of Removal ¶ 8.  Wellspring is incorporated in and has its principal place of business in Missouri.  Compl. ¶ 9; Notice of Removal ¶ 9.  The amount in controversy exceeds $75,000.

on representations in its marketing material to support its misrepresentation causes of action.  Wellspring also claims that the economic loss and the gist of the action doctrines bar DRWC's tort claims.

We conclude that DRWC's claims against Wellspring are barred by the gist of the action doctrine and the parol evidence rule.  Accordingly, we shall grant Wellspring's motion and dismiss the amended complaint against Wellspring.

In its motion, Sage contends that DRWC agreed to arbitrate all claims arising out of its agreement with Sage.  DRWC counters that it was unaware of the terms of the Sage End User License Agreement because Sage 300cloud was installed by a third-party. Accordingly, it contends that it is not bound by the agreement's arbitration provision. DRWC adds that there is no evidence that the current Sage End User License Agreement governed the relationship between the parties when the embezzlement occurred.

We find that the arbitration provision is valid and enforceable.  Therefore, we shall grant Sage's motion to compel arbitration.

### Factual Background[2]

Angela DiPietro-Sabatine, DRWC's former Accounting Administrator, who was responsible for issuing checks for accounts payable, was terminated in November 2019 for poor work performance.[3]  Two months later, DRWC's Finance Manager discovered irregularities in an account DiPietro-Sabatine had administered.[4]  An internal investigation revealed that she had issued herself at least 318 fraudulent checks totaling more than

---

[2] The facts are recited as alleged in the Amended Complaint.  For the purpose of Wellspring's motion, we accept them as true and draw all reasonable inferences from them in favor of DRWC.

[3] First Am. Compl. ¶¶ 2, 39–42, ECF No. 12 ["Am. Compl."].

[4] *Id.* ¶ 43.

$2.4 million between January 2013 and October 2019.[5]  She pled guilty to wire fraud, bank fraud, and identity theft in February 2022 in this court.[6]

DRWC blames the embezzlement scheme on software loopholes in Sage 300cloud and PrintBoss.[7]  It contends the software allowed DiPietro-Sabatine to convert a Sage-issued check to Word format, change the payee, and print the check with the altered payee while preserving the original payee within DRWC's accounting and vendor management records.[8]

Sage 300cloud is an accounts payable software.[9]  It allows users to "set up and maintain a general ledger . . . , generate financial reports, set up and maintain vendor accounts, enter or import transactions from various sources, print checks, and detect unrecorded transactions with bank reconciliations."[10]

DRWC has licensed Sage 300cloud, and its iterations, since 1996.[11]  It has renewed the Sage End User License Agreement annually through June 2022.[12]  The most recent version of the Agreement contained an arbitration provision mandating that the parties resolve all disputes by binding arbitration.[13]

---

[5] *Id.* ¶¶ 2–3, 44–51, 53–60.

[6] *Id.* ¶¶ 4, 52.

[7] *Id.* ¶¶ 53–60.

[8] *Id.* ¶¶ 54–59.

[9] *Id.* ¶ 39.

[10] *Id.* ¶ 13.

[11] *Id.* ¶¶ 16–17.

[12] *Id.* ¶ 18 ("Through the date of this filing, [June 2, 2022,] DRWC has annually renewed its license with Sage for the Sage Software.").

[13] Sage End User License Agreement § 9.2, ECF No. 12-1 (attached as Ex. A to Am. Compl.).

PrintBoss is a check printing program that integrates with other accounting software. In this case, it was integrated with Sage 300cloud.[14] It receives vendor information from Sage 300cloud and pairs that information with a vendor's bank information, and then prints checks payable to the vendor.[15]

Wellspring advertised PrintBoss as secure. Its marketing materials stated: (1) "Print security verified signatures"; (2) "**PrintBoss** – Print with <u>Quality</u> and <u>Security</u>!"; (3) "Check printing made easy and secure . . ."; (4) "Either a password or a diskette makes the signature secure"; and (5) "All Wellspring Software check stock is Toner Grip paper because writing a check should never expose your money to easy fraud."[16]

On its website, Wellspring boasted PrintBoss's security, representing: "User permissions, encrypted bank information, and electronic signatures make your payments secure. Feel safe knowing PrintBoss is a trusted Sage Endorsed Partner."[17] DRWC complains that Wellspring did not disclose that PrintBoss could be used to export and alter checks in other software programs, like Microsoft Word.[18]

DRWC contends it purchased PrintBoss relying on Wellspring's representations that it was secure.[19] DRWC has renewed the PrintBoss Software License Agreement ("PrintBoss License") annually from 1999 through June 2022.[20]

---

[14] Am. Compl. ¶¶ 14, 39.

[15] *Id.* ¶ 14.

[16] Printboss Marketing Materials at 1–2, ECF No. 12-4 (attached as Ex. D to Am. Compl.) (emphasis in original); *see also* Am. Compl. ¶ 33. DRWC believes Wellspring's representations are substantially similar to those made by the company since 2012. *Id.* ¶ 34.

[17] *Id.* ¶ 15.

[18] *Id.* ¶¶ 35–38.

[19] *Id.* ¶¶ 60, 95–97, 118–20.

[20] *Id.* ¶ 30.

The PrintBoss License Agreement contains a disclaimer of all express and implied warranties other than a limited thirty-day warranty of materials and workmanship. The Limited Warranty and Disclaimer of Warranties Provisions provide:

> Limited Warranty: Wellspring warrants that for a period of thirty (30) days from the date of shipment from Wellspring: (i) the media on which the Software is furnished will be free of defects in materials and workmanship under normal use; and (ii) the Software substantially conforms to its published specifications. Except for the foregoing, the Software is provided AS IS. This limited warranty extends only to Customer as the original licensee. Customer's exclusive remedy and the entire liability of Wellspring and its suppliers under this limited warranty will be, at Wellspring or its service center's option, repair, replacement, or refund of the Software if reported (or, upon request, returned) to the party supplying the Software to Customer. In no event does Wellspring warrant that the Software is error free or that Customer will be able to operate the Software without problems or interruptions.

> This warranty does not apply if the software (a) has been altered, except by Wellspring, (b) has not been installed, operated, repaired, or maintained in accordance with instructions supplied by Wellspring, (c) has been subjected to abnormal physical or electrical stress, misuse, negligence, or accident, or (d) is used in ultra hazardous activities.

> Disclaimer of Warranties. EXCEPT AS PROVIDED ABOVE, THIS SOFTWARE AND ANY RELATED SERVICES OR CONTENT ACCESSIBLE THROUGH THE SOFTWARE ARE PROVIDED "AS-IS", AND TO THE MAXIMUM EXTENT PERMITTED BY APPLICABLE LAW, WELLSPRING SOFTWARE INC. DISCLAIMS ALL OTHER REPRESENTATIONS AND WARRANTIES, EXPRESS OR IMPLIED, REGARDING THIS SOFTWARE, DISKS, RELATED MATERIALS AND ANY SUCH SERVICES OR CONTENT, INCLUDING THEIR FITNESS FOR A PARTICULAR PURPOSE, SECURITY, THEIR MERCHANTABILITY, OR THEIR NONINFRINGEMENT.

> . . . .

IN NO EVENT WILL WELLSPRING OR ITS SUPPLIERS BE LIABLE FOR ANY LOST REVENUE, PROFIT, OR DATA, OR FOR SPECIAL, INDIRECT, CONSEQUENTIAL, INCIDENTAL, OR PUNITIVE DAMAGES HOWEVER CAUSED AND REGARDLESS OF THE THEORY OF LIABILITY ARISING OUT OF THE USE OF OR INABILITY TO USE THE SOFTWARE EVEN IF WELLSPRING OR ITS SUPPLIERS HAVE BEEN ADVISED OF THE POSSIBILITY OF SUCH DAMAGES. THE ENTIRE LIABILITY OF WELLSPRING OR ITS SUPPLIERS FOR ANY REASON SHALL BE LIMITED TO THE AMOUNT PAID BY THE CUSTOMER FOR THE SOFTWARE. The foregoing limitations shall apply even if the above-stated warranty fails of its essential purpose. SOME STATES DO NOT ALLOW LIMITATION OR EXCLUSION OF LIABILITY FOR CONSEQUENTIAL OR INCIDENTAL DAMAGES.[21]

## Analysis

### *Wellspring's Motion*[22]

The PrintBoss License appears when users open the program.  The first sentence warns: "Do Not activate this Software until you have carefully read the following Software License Agreement."[23]  It then announces: "Activating the Software, opening the Software packaging, installing and using the Software certifies that you have read and understand this Agreement and consent to be bound by its terms and conditions."[24]

The PrintBoss License is a "clickwrap agreement." *See Specht v. Netscape Commc'ns Corp.*, 306 F.3d 17, 22 n.4 (2d Cir. 2002); *Noble v. Samsung Elec. Am., Inc.*, 682 F. App'x 113, 117 n.5 (3d Cir. 2017); *see also Chilutti v. Uber Techns., Inc.*, -- A.3d -

---

[21] PrintBoss Software License Agreement, at 2–3, ¶¶ 12–16, ECF No. 12-3 (attached as Ex. C to Am. Compl.).

[22] The PrintBoss License contains a Missouri choice-of-law provision.  *See id.* at 3, ¶ 20.  However, the parties cite Pennsylvania law in their briefing.  In any event, there is no conflict between Missouri and Pennsylvania law regarding the issues raised in this matter.  Accordingly, we apply Pennsylvania law.

[23] *Id.* at 1, ¶ 1.

[24] *Id.* at 1, ¶ 2.

-, 2022 WL 6886984, at *8–9 (Pa. Super. Ct. 2022) (citations omitted).   A clickwrap agreement "presents users with a message on his or her computer screen, requiring the user to manifest his or her assent to the terms of the . . . agreement by clicking on an icon."  *Specht*, 306 F.3d at 22 n.4; *see also Noble*, 682 F. App'x at 117 n.5 ("Clickwrap agreements are terms that appear on a consumer's computer screen and to which a consumer can manifest assent by clicking on an icon indicating agreement.") (citation omitted); *see also Berman v. Freedom Fin. Network, LLC*, 30 F.4th 849, 856 (9th Cir. 2022).  The user is unable to access the product unless the icon is clicked, signaling that the user has agreed to the terms of the contract.  *Specht*, 306 F.3d at 22 n.4.

Whether the user actually reads the terms to which she assents is immaterial. "Absent a showing of fraud, failure to read an enforceable clickwrap agreement, as with any binding contract, will not excuse compliance with its terms."  *Feldman v. Google, Inc.,* 513 F. Supp. 2d 229, 236 (E.D. Pa. 2007) (citing *Specht*, 306 F.3d at 30.).

Although DRWC acknowledges that it annually agreed to the terms of the PrintBoss License,[25] it seeks to evade dismissal by arguing that the PrintBoss License it attached to its own amended complaint is inapplicable because it is undated. Consequently, so DRWC argues, Wellspring's contract-based defenses are premature because we cannot determine without discovery whether the PrintBoss License attached to its amended complaint is the operative contract.

---

[25] "Through the date of this filing [of June 2, 2022], DRWC has annually renewed its license with Wellspring for PrintBoss."  Am. Compl. ¶ 30.

Wellspring confirms in its reply that "the Wellspring Licensing Agreement attached to the Amended Complaint is the <u>only</u> Licensing Agreement in existence . . . ."[26]  DRWC acknowledged in its response that "[c]ounsel for Wellspring recently represented that the License has remained identical since 2011."[27]  Mindful of its duty of candor, it does not suggest otherwise.

DRWC cannot avoid application of the PrintBoss License attached to the amended complaint by speculating there may be another contract containing different terms. Indeed, DRWC does not contend that there is any other version of the PrintBoss License. DRWC admits that it has renewed the license agreement every year since 1999 and does not dispute Wellspring's representation that the agreement attached to DRWC's amended complaint is the only one in existence.

Having determined that the PrintBoss License attached to the amended complaint governs the parties' relationship, we address Wellspring's arguments that DRWC's claims are barred by the gist of the action doctrine and the parol evidence rule.

The gist of the action doctrine precludes a plaintiff from bringing what is actually a breach of contract claim as a tort claim.[28]  *Bert Co. v. Turk*, 257 A.3d 93, 109–10 (Pa.

---

[26] Def., Wellspring Software, Inc. d/b/a Printboss', Reply in Further Supp. of its Mot. to Dismiss Pl.'s First Am. Compl. at 1–2, ECF No. 22 (emphasis in original).

[27] Pl. Del. River Waterfront Corp.'s Br. in Opp'n to Def. Wellspring Software, Inc.'s Mot. to Dismiss at 5 n.1, ECF No. 20.

[28] Missouri recognizes a similar doctrine:

> Missouri has never recognized a mere breach of contract as providing the basis for tort liability.  It is the act itself that serves as the basis of any tort liability, not the breach.  If the act, independent of the contract, would result in tort liability, it would continue to do so even in the presence of a contract. However, if in the absence of a contract the act would not represent a tort, the mere breach of the contract will not create tort liability.

*Chrysler Fin. Co., L.L.C. v. Flynn*, 88 S.W.3d 142, 151 (Mo. App. 1995) (citing *Khulusi v. Sw. Bell Yellow Pages, Inc.*, 916 S.W.2d 227, 230 (Mo.App.1995)).

Super. Ct. 2021) (citations omitted); *see also SodexoMAGIC, LLC v. Drexel Univ.*, 24 F.4th 183, 216 (3d Cir. 2022) (citations omitted).  The doctrine maintains the distinction between causes of action founded on the breach of a contractual duty created by the parties' relationship and those based on the breach of a social duty imposed on all individuals by society.

When the parties' obligations are defined by the terms of a contract and not by a duty imposed by social policy, a plaintiff may assert only a contract claim.  *Bert Co.*, 257 A.2d at 110 (quoting *J.J. DeLuca Co. v. Toll Naval Assocs.*, 56 A.3d 402, 413 (Pa. Super. Ct. 2012)).  Where there is a contract, the plaintiff may assert a tort claim only if it is the gist of the action and the contract is only incidental.  *Id.* (citing *Bruno v. Erie Ins. Co.*, 106 A.3d 48, 70–71 (Pa. 2014)).

In determining whether the gist of the action is based on a contract or a tort, we look to the nature of the duty allegedly breached.  *Patel v. Kandola Real Est., LP*, 271 A.3d 421, 431 (Pa. Super. Ct. 2021) (quoting *Bruno*, 106 A.3d at 68).  If the claim arises directly from a breach of a contractual duty created by the parties, it is a contract action.  If the claim arises from the violation of a broader social duty imposed by society and not by the parties to the action, it is a tort action.  *Bert Co.*, 257 A.3d at 110 (quoting *Bruno*, 106 A.3d at 68).  Thus, the substance of the allegations in the complaint is of "paramount importance."  *Patel*, 271 A.3d at 431 (quoting *Bruno*, 106 A.3d at 68).

The existence of a contract does not necessarily mean that a party's claim for damages resulting from the other party's conduct in performing the contract is a claim for breach of contract.  A breach of contract cause of action is based on the breach of a specific executory promise in the contract.  *Bruno*, 106 A.3d at 70.  Where it is alleged

that the defendant breached a duty that exists "independently and regardless of the contract" and was not created by the parties, it is a tort action.  *Id.* at 63.  If the claim arises indirectly from the breach of a "separate 'collateral' duty to perform a contractual obligation with skill and diligence," it is a tort action.  *Id.*

Here, the gist of this action is a breach of contract claim.  DRWC alleges that despite Wellspring's representations that its check printing program was secure, it was not.  As alleged, Wellspring delivered a product with a security loophole that allowed a former employee to embezzle more than $2.4 million.  DRWC's claims go to the performance of Wellspring's PrintBoss program.  The claims are grounded in contract.  Thus, the tort claims are barred by the gist of the action doctrine.

Even if DRWC's fraudulent and negligent misrepresentation claims were not barred by the gist of the action doctrine, they would still fail.  The parol evidence rule bars DRWC from introducing pre-contract statements.

The parol evidence rule bars evidence of prior representations concerning matters covered in a fully integrated agreement.[29]  *SodexoMAGIC*, 24 F.4th at 212–13 ("Once a writing is determined to be the parties' entire contract, the parol evidence rule applies and evidence of any previous oral or written negotiations or agreements involving the same subject matter as the contract is almost always inadmissible to explain or vary the terms of the contract." (quoting *Yocca v. Pitts. Steelers Sports, Inc.*, 854 A.2d 425, 436–37 (Pa.

---

[29] Missouri also applies the parol evidence rule.  *See, e.g., Clark v. Smith*, 644 S.W.3d 835, 841–42 (Mo. App. 2022) ("The parole evidence rule prohibits use of oral evidence to contradict or change the terms of a written, unambiguous and complete contract absent fraud, common mistake, accident or erroneous *842 omission." (quoting *Harms v. Harms*, 496 S.W.3d 534, 570 n.9 (Mo. App. 2016))); *Hammond v. Toole*, 644 S.W.3d 289, 294 (Mo. App. 2022) ("The parol evidence rule bars extrinsic evidence in construing an integrated contract, unless the contract is ambiguous." (quoting *Lee v. Bass*, 215 S.W.3d 283, 288 (Mo. App. 2007))).

2004)); *see also Gasbarre Prods., Inc. v. Smith*, 270 A.3d 1209, 1220–21 (Pa. Super. Ct. 2022) (citations omitted).  An integration clause demonstrates that the contract represents the parties' entire agreement.  *Yocca*, 854 A.2d at 436.

The PrintBoss License integration clause states: "This License constitutes the entire License between the parties with respect to the use of the Software."[30]  Wellspring also disclaimed any prior representations and warranties.

Because the PrintBoss License expressly disclaimed "ALL OTHER REPRESENTATIONS AND WARRANTIES, EXPRESS OR IMPLIED, REGARDING THIS SOFTWARE . . . INCLUDING THEIR SECURITY,"[31] the parol evidence rule bars admission of Wellspring's prior statements.  Thus, DRWC cannot make out a claim for fraudulent or negligent misrepresentation based on statements made in marketing materials.[32]

Because DRWC's claims are barred by the gist of the action doctrine and the parol evidence rule, we shall grant Wellspring's motion and dismiss the amended complaint against Wellspring.

---

[30] PrintBoss Software License Agreement at 3, ¶ 20.

[31] *Id.* at 2–3, ¶ 14.

[32] Even if the parol evidence rule did not bar admission of Wellspring's prior statements, DRWC still could not make out a claim for fraudulent or negligent misrepresentation based on statements made in marketing materials.  The security representations in Wellspring's marketing materials do not pertain to internal fraud committed by a licensee's employee.

*Sage's Motion*[33]

Under the Federal Arbitration Act, "[a] party to a valid and enforceable arbitration agreement is entitled to a stay of federal court proceedings pending arbitration as well as an order compelling such arbitration." *In re Pharmacy Ben. Managers Antitrust Litig.*, 700 F.3d 109, 116 (3d Cir. 2012) (quoting *Alexander v. Anthony Int'l, L.P.*, 341 F.3d 256, 263 (3d Cir. 2003)); *see also Morgan v. Sundance, Inc.*, 142 S. Ct. 1708, 17111 (2022) (citing 9 U.S.C. §§ 3–4).

We must determine whether a valid agreement to arbitrate exists. *Abdurahman v. Prospect CCMC LLC*, 42 F.4th 156, 159 (3d Cir. 2022) (citations omitted).  To determine whether the parties agreed to arbitrate, we apply state-law agency and contract principles. *Kirleis v. Dickie, McCamey & Chilcote, P.C.*, 560 F.3d 156, 160 (3d Cir. 2009) (quoting *First Options of Chic., Inc. v. Kaplan*, 514 U.S. 938, 944 (1995)); *see also Wisler v. Manor Care of Lancaster PA, LLC*, 124 A.3d 317, 322-323 (Pa. Super. Ct. 2015) (citations omitted).  Because the parties agree that there is no conflict between Georgia and Pennsylvania law, we apply Pennsylvania contract law.  *See Abdurahman*, 42 F.4th at 159 n.4 (citing *Kirleis*, 560 F.3d at 160).

Where the plaintiff fails to come forward with additional facts sufficient to place the agreement to arbitrate at issue, a motion to compel arbitration is considered under a Rule

---

[33] The Sage End User License Agreement contains a Georgia choice-of-law provision:

> 9.1. <u>Law</u>.  The validity, construction, and application of the Agreement will be governed by the internal laws of (i) the State of Georgia (if you are contracting with Sage Software, Inc.) . . . in each case excluding its conflict of laws provisions.

Sage End User License Agreement § 9.1.  However, the parties cite Pennsylvania law in their briefing.  There is no conflict between Georgia and Pennsylvania law regarding the issues raised in this matter.  Accordingly, we apply Pennsylvania law.

12(b)(6) standard.  "[W]hen it is clear on the face of the complaint that a validly formed and enforceable arbitration agreement exists and a party's claim is subject to that agreement, a district court must compel arbitration under a Rule 12(b)(6) pleading standard 'without discovery's delay.'"  *MZM Constr. Co., Inc. v. N.J. Bldg. Laborers Statewide Benefit Funds*, 974 F.3d 386, 406 (3d Cir. 2020) (quoting *Guidotti v. Legal Helpers Debt Resol., L.L.C.*, 716 F.3d 764, 776 (3d Cir. 2013)).  Where the complaint does not establish on its face that the parties agreed to arbitration, a motion to compel arbitration is decided under the summary judgment standard.  *Guidotti*, 716 F.3d at 774.

Because DRWC casts doubt on the efficacy of the Sage End User License Agreement it attached to its own amended complaint, we converted the motion to dismiss to a motion for summary judgment to the extent it sought to compel arbitration.[34]  We invited the parties to submit supplemental memorandum of law and information pertinent to the controlling Sage End User License Agreement.  Sage and DRWC both submitted supplemental memorandum with declarations and exhibits.[35]  Most of the information and argument was not new.

Sage reiterated its argument that DRWC could not have installed Sage 300cloud without assenting to the terms of the Sage End User License Agreement.[36]  It attached a declaration from its Senior Product Manager Richard Jang to show that the controlling Sage End User License Agreement is the current one.[37]   Jang declared that DRWC

---

[34] Order (Oct. 20, 2022), ECF No. 26.

[35] *See* Suppl. to Reply in Further Supp. of Def. Sage Software, Inc.'s Mot. to Dismiss Pl.'s Am. Compl., ECF No. 27 ["Def.'s Suppl. Br."]; Pl. Delaware River Waterfront Corporation's Suppl. Br. in Opp'n to Def. Sage Software, Inc.'s Mot. to Dismiss, ECF No. 28 ["Pl.'s Suppl. Br."].

[36] Def.'s Suppl. Br. at 1–2.

[37] *Id.* at 1.

accepted the terms of the agreement on December 20, 2020 when it began using Version 2021 (6.8) of the software and that DRWC could not have used or installed the software without accepting the terms of the agreement.[38]  It also attached the current Sage End User License Agreement as an exhibit.[39]

DRWC argues that there is no evidence that the Sage End User License Agreement was presented to DRWC.  It submitted two declarations from Larry Bell, Chief Financial Officer of DRWC, who was not employed by DRWC until April 12, 2021,[40] and Joseph Forkin, who has been employed by DRWC since June 1997 and has been President of DRWC since July 2017.[41]  Both declared that they and other employees never agreed to the terms of the license agreement.[42]  DRWC cites these affidavits as evidence that its employees never saw the terms of the Sage End User License Agreement.[43]

DRWC attached seven exhibits to Bell's declaration.  Three of the seven are screenshots of Sage 300cloud.  DRWC relies on them to show that the Sage End User License Agreement does not appear each time the program is opened.[44]  Instead, users

---

[38] Decl. of Richard Jang in Support of Def. Sage Software, Inc.'s Suppl. To Reply in Further Supp. of Def. Sage Software, Inc's Mot. to Dismiss Pl.'s Am. Compl. ¶¶ 3–4, 7–8, ECF No. 27-1 at 2–4 (attached as Exhibit 1 to Def.'s Suppl. Br.) ["Jang Decl. #2"].

[39] *See* Sage End User License Agreement, ECF No. 27-1 at 6–9 (attached as Ex. A to Jang Decl. #2).

[40] Decl. in Supp. of Pl.'s Suppl. Br. ¶ 2, ECF No. 28-1 at 2–5 ["Bell Decl."] (attached as Ex. A to Pl.'s Suppl. Br.).

[41] Decl. in Supp. of Pl.'s Suppl. Br. ¶ 2, ECF No. 28-2 ["Forkin Decl."] (attached as Ex. B to Pl.'s Suppl. Br.).

[42] Bell Decl. ¶¶ 4, 6; Forkin Decl. ¶¶ 4–7.

[43] Pl.'s Suppl. Br. at 5–8.

[44] *Id.* at 6; Bell Decl. ¶¶ 7–13.

must login,[45] click the "About" icon on the main account screen,[46] click on "Licenses" in the "About" window,[47] and click on "License Info" in the "Licenses" window to find the Sage End User License Agreement.[48]

The other exhibits are pages of records from DRWC regarding Sage and KasTech Consulting, Inc ("KasTech").  Exhibit A-4 is a copy of the Sage Business Partner of Record Policy and Change of Business Partner of Record Designation Form.[49]  DRWC cites this exhibit to show that Sage contracted with KasTech "to be responsible for the 'overall satisfaction' of Sage's customers, including installing the Sage Software on customers' servers."[50]  Exhibit A-5 is the Client Service Contract between DRWC and KasTech.[51] DRWC relies on this exhibit to show it engaged KasTech as an independent contractor to install Sage 300cloud.[52]  Exhibit A-6 and A-7 are KasTech invoices that DRWC attached to show KasTech installed Sage 300cloud at DRWC.[53]

DRWC relies on the declarations and exhibits collectively to show that none of its employees installed Sage 300cloud.  Because Sage 300cloud was installed by a third-party, DRWC argues that it was unaware of the terms of the Sage End User License

---

[45] Sage 300cloud Login Screen, ECF No. 28-1 at 7 (attached as Ex. A-1 to Bell Decl.).

[46] Sage 300cloud Main Screen, ECF No. 28-1 at 9 (attached as Ex. A-2 to Bell Decl.).

[47] *Id.*

[48] Sage 300cloud Product License Agreement Screen, ECF No. 28-1 at 11 (attached as Ex. A-3 to Bell Decl.).

[49] Sage Business Partner of Record Policy & Change of Business Partner of Record Designation, ECF No. 28-1 at 13–15 (attached as Ex. A-4 to Bell Decl.).

[50] Pl.'s Suppl. Br. at 5–6.

[51] Client Service Contract ¶ 1, ECF No. 28-1 at 17 (attached as Ex. A-5 to Bell Decl.).

[52] Pl.'s Suppl. Br. at 2, 6.

[53] KasTech Invoice No. IN006308 (Oct. 31, 2016), ECF No. 28-1 at 19 (attached as Ex. A-6 to Bell Decl.); KasTech Invoice No. IN007841 (Sept. 30, 2018), ECF No. 28-1 at 21–22 (attached as Ex. A-7 to Bell Decl.); Pl.'s Suppl. Br. at 2, 6.

Agreement.  Accordingly, it contends that it is not bound by the agreement's terms, including the arbitration provision.

DRWC did not install Sage 300cloud.[54]  It contracted with KasTech Consulting, Inc. ("KasTech") to do so.[55]  The question is whether KasTech acted as DRWC's agent within the scope of its agency when it installed the software and agreed to the terms of the Sage End User License Agreement.

The three basic elements of agency are: (1) the principal manifested its intent that the agent act on its behalf; (2) the agent accepted the undertaking; and (3) the parties understood that the principal was in control of the undertaking.  *Basile v. H & R Block, Inc.*, 761 A.2d 1115, 1120 (Pa. 2000) (citations omitted).  "Agency cannot be inferred from mere relationships . . . and we do not assume agency merely because one person acts on behalf of another."  *Wisler*, 124 A.3d at 323 (citing *Walton v. Johnson*, 66 A.3d 782, 787 (Pa. Super. Ct. 2013)).  Instead, we look to the facts to determine whether the principal intended to create an agency relationship.  *Id.* (citing *Walton*, 66 A.3d at 787). No special formalities are required to create the relationship.  *Basile*, 761 A.2d at 1120 (citations omitted).

An agency relationship may be created by express or implied authority.  *Walton*, 66 A.3d at 786 (citations omitted).  "Express authority exists where the principal deliberately and specifically grants authority to the agent as to certain matters."  *Wisler*, 124 A.3d at 323 (quoting *Walton*, 66 A.3d at 786).  Implied authority arises where the agent's actions are "proper, usual and necessary" to carry out express agency.  *Id.* at 324

---

[54] Pl.'s Suppl. Br. at 2, 6.

[55] Client Service Contract ¶ 1.

(quoting *Walton*, 66 A.3d at 786).  "A principal will be bound by his agent's acts—including an agreement to arbitrate—if the agent has actual or [implied] authority."  *In re Rotavirus Vaccines Antitrust Litig.*, 30 F.4th 148, 154 (3d Cir. 2022) (citing *Wisler*, 124 A.3d at 323).

DRWC and KasTech executed a Client Service Contract.  KasTech agreed to "provide services including but not limited to Sage Accpac ERP and SageCRM software installation, . . ."[56]  By agreeing to the terms of the Client Service Contract, DRWC manifested its intent that KasTech would act on its behalf in the installation process. KasTech accepted that responsibility.  KasTech exercised its express authority by installing Sage 300cloud.

By granting KasTech express authority, DRWC gave KasTech implied authority to do what was "proper, usual and necessary" to install Sage 300cloud.  *See Walton*, 66 A.3d at 786 (citation omitted).  The Sage End User License Agreement is a "clickwrap agreement."  Unless KasTech agreed to the terms of the Sage End User License Agreement, it could not install the software.  What is did was proper, usual and necessary to the installation of the program.  Therefore, KasTech had the implied authority to do so.

KasTech had express and implied authority to activate and install Sage 300cloud, and DRWC is bound by its actions.  *See In re Rotavirus Vaccines Antitrust Litig.*, 30 F.4th at 154 (citing *Wisler*, 124 A.3d at 323).  That includes agreeing to the terms of the Sage End User License Agreement.  Those terms included an agreement to arbitrate any dispute.[57]  *Id.* ("A principal will be bound by his agent's acts—including an agreement to

---

[56] Client Service Contract ¶ 1.

[57] Paragraph 9.2 of the Agreement contains the following arbitration provision:

> 9.2. <u>Arbitration</u>.  The parties agree to resolve all disputes related to this Agreement by binding individual arbitration before one arbitrator and will not bring or participate in any representative action.  The arbitration shall

arbitrate—if the agent has actual or apparent authority." (citing *Wisler*, 124 A.3d at 323)). Because "the authority to agree to an arbitration clause is part and parcel of the agency relationship in commercial contexts," *Id.* at 157 (citations omitted), we find that DRWC is bound by the arbitration provision in the Sage End User License Agreement.

Whether DRWC's employees were aware of the specific terms of the agreement is of no moment—its agent, KasTech, was.  Assuming it was KasTech's responsibility to notify DRWC of the provision, its failure to notify DRWC does not destroy the agency relationship.  *Id.* at 156 (citing Restatement (Third) of Agency § 5.03 cmt. b (Am. L. Inst. 2006)).  A lack of notice goes to the adequacy of KasTech's performance of its duty to DRWC, not to the existence of the agency relationship.  *Id.*

In its attempt to avoid arbitration, DRWC contends that there is no evidence that the current Sage End User License Agreement governs the relationship between the parties when the embezzlement occurred.  We disagree.

There are prior versions of the Sage End User License Agreement.  Sage attached the 2012, 2014, 2016, 2017, 2018, 2019, and 2020 versions to its reply brief.[58]  Like the

---

be administered by JAMS pursuant to its Comprehensive Arbitration Rules and Procedures and in accordance with the Expedited Procedures in those Rules, and shall take place in (i) Atlanta, Georgia (if you are contracting with Sage Software, Inc.) . . . . Any challenge to arbitrability shall be decided by the arbitrator.  Judgment on the arbitration award may be entered in any court having jurisdiction. . . .

Sage End User License Agreement § 9.2.

[58] *See* 2012 Sage End User License Agreement, ECF No. 23-2 (attached as Ex. A to Decl. in Supp. of Def. Sage Software, Inc.'s Mot. to Dismiss Pl.'s Am. Compl. ¶ 4, ECF No. 23-1 ["Jang Decl. #1"]); 2014 Sage End User License Agreement, ECF No. 23-3 (attached as Ex. B to Jang Decl. #1); 2016 Sage End User License Agreement, ECF No. 23-4 (attached as Ex. C to Jang Decl. #1); 2017 Sage End User License Agreement, ECF No. 23-5 (attached as Ex. D to Jang Decl. #1); 2018 Sage End User License Agreement, ECF No. 23-6 (attached as Ex. E to Jang Decl. #1); 2019 Sage End User License Agreement, ECF No. 23-7 (attached as Ex. F to Jang Decl. #1); 2020 Sage End User License Agreement, ECF No. 23-8 (attached as Ex. G to Jang Decl. #1).

current one, the prior agreements contained an arbitration provision.[59]   Those agreements contain a different choice of law clause[60] and do not specify that the arbitration take place in Georgia.[61]

It does not matter that the arbitration provisions in the prior agreements differ from the current agreement.   The later of two agreements as to the same subject matter generally supersedes the prior agreement.  *See Jaludi v. Citigroup*, 933 F.3d 246, 256 (3d Cir. 2019) (citing *In re Klugh's Estate*, 66 A.2d 822, 825 (Pa. 1949)); *see also Collier v. Nat'l Penn Bank*, 128 A.3d 307, 311 (Pa. Super. Ct. 2015).  Here, the agreements cover the same subject matter—the method for resolving disputes.

The current Sage End User License also contains an integration clause.  It reads: "This Agreement represents the entire agreement between the parties and supersedes all prior or contemporaneous writings . . . with respect to its subject matter."[62]  It explicitly states that it supersedes all prior writings.  Prior writings include previous versions of the

---

[59] 2012 Sage End User License Agreement ¶ 10; 2014 Sage End User License Agreement ¶ 10; 2016 Sage End User License Agreement ¶ 10; 2017 Sage End User License Agreement ¶ 10; 2018 Sage End User License Agreement ¶ 10; 2019 Sage End User License Agreement ¶ 10; 2020 Sage End User License Agreement ¶ 10.

[60] *Compare* Sage End User License Agreement ¶ 9.1 ("The validity, construction, and application of the Agreement will be governed by the internal laws of (i) the State of Georgia (if you are contracting with Sage Software, Inc.) . . ."), *with* 2012 Sage End User License Agreement ¶ 10 ("This Agreement shall be governed by the laws of (i) the State of California if primary Use of the Software occurs in any jurisdiction other than Canada, . . ."), *and* 2014 Sage End User License Agreement ¶ 10 (same), *and* 2016 Sage End User License Agreement ¶ 10 (same), *and* 2017 Sage End User License Agreement ¶ 10 (same), *and* 2018 Sage End User License Agreement ¶ 10 (same), *and* 2019 Sage End User License Agreement ¶ 10 (same), *and* 2020 Sage End User License Agreement ¶ 10 (same).

[61] *Compare* Sage End User License Agreement ¶ 9.2 ("The arbitration . . . shall take place in (i) Atlanta, Georgia (if you are contracting with Sage, Software, Inc.) . . ."), *with* 2012 Sage End User License Agreement ¶ 10 (does not specify location of arbitration), *and* 2014 Sage End User License Agreement ¶ 10 (same), *and* 2016 Sage End User License Agreement ¶ 10 (same), *and* 2017 Sage End User License Agreement ¶ 10 (same), *and* 2018 Sage End User License Agreement ¶ 10 (same), *and* 2019 Sage End User License Agreement ¶ 10 (same), *and* 2020 Sage End User License Agreement ¶ 10 (same).

[62] Sage End User License Agreement ¶ 12.6,

licensing agreement.   Thus, the latest Sage End User License attached to DRWC's amended complaint governs.

Because DRWC granted KasTech the express authority to install Sage 300cloud and the implied authority to agree to the Sage End User License Agreement, we find that DRWC agreed to arbitrate.  Therefore, we shall grant Sage's motion to compel arbitration.